**Manuel WELCH, et al., Plaintiffs,**

v.

**Lillie V. McKENZIE, et al., Defendants.**

**Civ. A. No. J84–0030(B).**

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 30, 1984.

**1550**

Carroll Rhodes, Hazlehurst, Miss., for plaintiffs.

Richard E. Stratton, II, Brookhaven, Miss., J.W. Henley and Brand Henley, Hazlehurst, Miss., for defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARBOUR, District Judge.

This cause came on for hearing from June 28, to July 2, 1984, on the Complaint filed by Manuel Welch, Sandra Faye Tillman, Reverend Jimmie Charles Hicks and Mary Jane Tillman, Plaintiffs, against the members of the Copiah County Board of Election Commissioners, the Copiah County Democratic Executive Committee, the Registrar for Copiah County, Mississippi, and W.E. Hood, Defendants. The Election Commissioner at the time, Mildred Ferguson, was specifically named in her official capacity but has since died and the present Registrar, Edna Edwards, was allowed to be substituted under Rule 25(d), F.R.Civ.P. All of the Defendants except W.E. Hood were sued in their official capacities. W.E. Hood was sued individually.

On October 20, 1983, this Court in the case of *Jessie Pendleton, et al, v. Warren E. Hood, et al,* Civil Action No. J84–0519(B), a redistricting suit, issued an Order and Memorandum Opinion setting a schedule for elections for the offices of Supervisors of Copiah County, Mississippi. The date for the first party primary election was scheduled for November 29, 1983. The run-off primary election was scheduled for December 13, 1983. The general election was scheduled for December 27, 1983.

The Plaintiff, Manuel Welch, and the Defendant, W.E. Hood, then the incumbent, received the most votes in the first Democratic party primary for Supervisor of District 4. As such they qualified for the December 13, 1983 run-off primary. Plaintiffs Tillman, Hicks and Tillman are black registered voters of District 4, Copiah County, Mississippi.

In the December 13, 1983, run-off primary for supervisor for District 4 of Copiah County, Mississippi, Defendant W.E. Hood received a total of 877 votes and Plaintiff Manuel Welch received a total of 858 votes, making the victory margin 19 votes. Hood was eventually declared the winner of the December 27, 1983, general election and is currently serving as Super-

visor of District 4 of Copiah County, Mississippi.

Manuel Welch is black and W.E. Hood is white.

The Plaintiffs allege a cause of action under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, asserting that the episodic practices as hereinafter described resulted in discrimination against Blacks in District 'Four, Copiah County, Mississippi, and thus violated Section 2. Further, they claim that the election was held in such a manner as to violate the Plaintiff's fifteenth amendment rights against having their vote denied or abridged on account of race. The Defendants filed Motions to Dismiss on the basis of jurisdiction but because the proof on those motions was inseparable from the proof on the case in chief the Court took those Motions under advisement.

### MISSISSIPPI ABSENTEE VOTING PROVISIONS

Since the allegations of the Plaintiffs are based upon alleged violations of the provisions of Mississippi law dealing with the right of absentee electors to cast ballots under certain circumstances, it is necessary in understanding the case to outline the procedure by which an eligible elector may obtain and cast an absentee ballot. These provisions are set forth in the Mississippi Code of 1972, Annotated, and will be referred to hereinafter only by section number.

**1.** STATE OF MISSISSIPPI
COUNTY OF _____

I, _____, do solemnly swear that this envelope contains the ballot marked by me indicating my choice of the candidates or propositions to be submitted at the election to be held on the _____ day of _____, 19___, and I hereby authorize the registrar to place this envelope in the ballot box on my behalf, and I further authorize the election managers to open this envelope and place my ballot among the other ballots cast before such ballots are counted, and record my name on the poll list as if I were present in person and voted.

I further swear that I have marked the enclosed ballot in secret.

_____
Signature of Voter

Section 23–9–603 sets forth those certain registered voters who are eligible for casting absentee ballots, including such persons as students, persons who will be absent more than 50 miles from home on election day because of employment, and persons who are sick or physically unable to go to the polls.

The eligible absentee electors are divided into two classes, the first being those who are able to present themselves personally to the county registrar (hereinafter Section 23–9–605(1) electors) and the second being those temporarily residing outside of the county or who are incapacitated so that they cannot go in person to the office of the registrar (hereinafter Section 23–9–605(2) electors).

The Section 23–9–605(1) electors must appear in person before the registrar and file an application for an absentee ballot. Section 23–9–407 sets forth a form for such application which is to be signed and sworn by the elector. Section 23–9–611 provides that the registrar, upon completion of the application, shall immediately deliver the ballot to the applicant, who shall mark the ballot in secret and place it in an envelope furnished to him by the registrar.

Section 23–9–611 requires that the ballot envelope have printed on the back of it an affidavit to be signed by the voter.[1] Section 23–9–413 requires a Certificate of Attesting Witness to be printed on the back of the envelope.[2]

SWORN TO AND SUBSCRIBED before me, _____, this the _____ day of _____, 19___.

_____
(Registrar)

**2.** CERTIFICATE OF ATTESTING WITNESS

Personally appeared before me, the above-named voter, known by me to be the persons named, who after being duly sworn or having affirmed, subscribed the foregoing oath or affirmation. That said voter exhibited to me his blank ballot; that said ballot was not marked or voted before the said voter exhibited the ballot to me; that said voter then retired out of my presence, but within my sight, and voted his ballot so that I could not see how he voted; that no one was present with said voter as he marked his ballot; that the said voter was not solicited or advised by me to vote for any candidate,

When the absentee elector has marked his ballot and placed it in the envelope, he is to sign across the flap of the envelope, Section 23–9–411; sign the Affidavit before the registrar, Section 23–9–611; have the registrar or other attesting witness sign the Certificate of Attesting Witness, Section 23–9–413; and deliver the envelope containing the ballot to the registrar, Section 23–9–611. It is clear that both the Affidavit and the Certificate of Attesting Witness must be signed. *Fouche v. Ragland*, 424 So.2d 559, 561 (Miss.1982).

The registrar shall keep an accurate list of all persons voting such ballots and shall keep on file the application and the envelope containing the ballot of each such voter until such time as they are deposited in the proper precinct ballot boxes prior to the election, Section 23–9–405.

Thus, for any person wishing to vote by absentee ballot who is able to present himself to the registrar, he must do so in person and must cast the ballot in person in the registrar's office.

Section 23–9–605(2) allows the voting by absentee ballot by those who are unable to go in person to the office of the registrar because they are temporarily residing outside of the county or are physically incapacitated. In such instance Section 23–9–605(2) provides that such persons may obtain absentee ballots *by mail.* That same section then requires the registrar to "send" the absentee voter his absentee ballot. This raises a question which the Court need not answer as to whether this section requires that the ballot be "sent" by the United States Mail. Section 23–9–409 requires the registrar to enclose with the ballot sent to the absentee elector separate printed instructions as to how the ballot shall be marked, authenticated and returned to the registrar.

Section 23–9–605(2) absentee electors must mark their ballots and authenticate them under the same procedure outlined

question, or issue, and that the voter, after marking his ballot, placed it in the envelope, closed and sealed the envelope in my presence, and signed and swore or affirmed the above certificate.

above for Section 23–9–605(1) absentee electors by signing across the flap of the envelope, by signing the Affidavit and by having a witness sign the Certificate of Attesting Witness. The only difference in the two types of absentee voters is that the Section 23–9–605(2) absentee voter may sign before certain persons authorized to administer oaths as opposed to signing before the registrar as the Section 23–9–605(1) absentee elector must do.

Section 23–9–613 requires the Section 23–9–605(2) absentee elector *to mail* his envelope containing his ballot to the registrar so that it is received by the registrar prior to 12:00 noon of the day preceding the day of the election.

Accordingly, each member of that class of absentee electors who cannot appear personally before the registrar must file his application *by mail,* must thereafter receive his absentee ballot and finally must return his absentee envelope with his marked ballot contained therein to the registrar *by mail.*

## MISSISSIPPI PROVISIONS FOR COUNTING AND CHALLENGING ABSENTEE BALLOTS

Sections 23–9–405 and 23–9–415 require the registrar to keep an accurate list of all persons voting by absentee ballot and to furnish each precinct manager a list of names of all persons in each respective precinct voting by absentee ballot. In preparing the ballot boxes for distribution to the various precincts prior to the election, the registrar is required to place the application and the envelope containing each absentee elector's ballot in the proper precinct box. Thus, the unopened ballot envelopes, together with their supporting application, go to each precinct so that at the end of the election day they may be examined and the ballots counted along with the other votes cast at that precinct.

| (Attesting Witness) | (Address) |
| --- | --- |
| (Official Title) | (City and State) |

Sections 23–9–417, 419, 421 and 423 deal with the procedures for examining and counting the absentee ballots which have been placed in the ballot boxes for each precinct while still sealed in their envelopes. At the close of the polls the election managers for each precinct are required to take the envelopes containing the ballots from each box and to examine the envelopes together with the applications for the absentee ballots. The signatures are to be compared and a check is to be made as to whether the absentee elector has actually voted in person during the day. In addition, the affidavit and certificate on the back of the envelope are to be examined. If there is any problem, the election officials are required to write the word "rejected" across the face of the envelope and to set it aside. If any person present at the polls chooses to challenge an absentee ballot he may do so for the same reasons as any voter personally presenting himself might be challenged, or for any defect in the absentee ballot, its envelope or the application. The poll officials shall preserve all applications, envelopes and the list of absentee voters, along with the ballots and other election materials and return the same to the registrar.

Section 23–3–25 deals with the method of challenging the votes. That section allows any vote to be challenged at the polls by a poll manager or by another authorized challenger, including a candidate or his authorized designee. If a ballot is challenged, that section requires that the ballot be marked on the back with the word "challenged" and placed in a separate envelope and separately counted apart from the unchallenged votes. If a challenge is successful at the polls, the poll manager shall write the word "rejected" on the back of the ballot and shall also write the name of the voter on the back of the ballot. Such ballot shall be placed in a separate envelope. It is not clear as to whether a challenged but unrejected ballot shall be placed in a separate envelope with the name of the voter placed on the envelope. However, if this is not a requirement, there would be no way in the case of multiple challenged ballots to determine which ballot belonged to which voter in the event some of the challenges are allowed and some are not. Section 23–3–25 does state, however, "The failure of a candidate to challenge a vote or votes at a box shall not preclude him from later showing, in the manner provided by law, that one or more votes have been improperly received or counted or returned as regards said box."

### FINDINGS OF FACT

This Court in the case of *Jesse Pendleton, et al., v. W.E. Hood, et al.,* Civil Action No. J83–0519(B) issued its Order and Memorandum Opinion dated October 20, 1983, in which it found a past history of racial discrimination against blacks in Copiah County, Mississippi. In order to eliminate the necessity of a re-presentation to the Court of the same basic proof in regard to those matters, the parties in this case stipulated that the Court would reach the same conclusion in regard to the issue of past racial discrimination in Copiah County, Mississippi, and that the findings in regard to *Pendleton v. Hood* could be made in this case.

The principal complaints of the Plaintiffs revolve around the mishandling of the absentee ballot procedures. It is clear that those procedures were violated and the questions presented to the Court are whether the practices and procedures were of the episodic type covered by the Voting Rights Act or whether the conduct amounted to such gross fraud as to reach the point of being a constitutional violation.

■ It is not, of course, improper for a candidate to urge his supporters to utilize the absentee voting procedures where they are applicable, nor is it improper for a candidate to instruct his supporters as to how they may obtain and vote such ballots. It is clear that the Defendant, W.E. Hood, exerted considerable efforts in doing this. Of the 115 absentee ballots cast, Hood received 111 votes to Welch's 4 votes. This number of absentee ballots greatly exceeded the number of absentee ballots cast in any previous election in Copiah County. It is the method of obtaining these absentee

ballots, of casting them and of counting them that must draw the attention of the Court.

As stated above, there are two classes among those person eligible to cast their ballot through the absentee process. The first class consists of those persons who are able to present themselves at the registrar's office and the second class consists of those persons who are either temporarily residing elsewhere or are physically incapacitated so that they cannot present themselves directly to the registrar. In practically every instance of the 115 absentee ballots cast in the second primary in the race for Supervisor of District 4 of Copiah County, the ballots were improperly obtained. The proof is clear that lists were prepared by supporters of W.E. Hood of those voters who desired absentee ballots. Those lists were presented to the registrar's office by one of three persons, Edwin Earl Hood, Arnold Carraway or Mildred Brent. Edwin Earl Hood is the son of W.E. Hood. Arnold Carraway is a county employee, working for the District of W.E. Hood. Mildred Brent is a county employee whose primary duties are the preparation of purchase orders at the request of W.E. Hood or the other county supervisors. In only a few instances did the absentee voters present themselves directly to the registrar's office for the purpose of applying for and voting an absentee ballot. In no instance did any of those not presenting themselves directly to the registrar's office request an absentee ballot by mailing the proper application to the registrar's office.

Upon presentation of the lists to the registrar's office, either of the two deputy registrars, as directed by registrar Mildred Ferguson, prepared an application for each of the names listed and marked the application showing the reason why such voter was eligible to vote by absentee ballot. This reason apparently had been placed on the list by whomever had prepared it.

Upon completion of the application, the registrar or one of her deputies clipped the application to an absentee ballot and an absentee ballot envelope. At various times these "packets" were handed either singly or in groups numbering several to Arnold Carraway, Mildred Brent or Ricky Smith, another county employee working in the District of W.E. Hood. None of the absentee ballots were mailed to any voters.

After receiving the packets, those persons then apparently distributed the packets to the various voters and W.E. Hood or his supporters had notaries public go to the houses of the voters. The notaries public were Richard Belding, another county employee, and Denise Strong. Apparently the procedure was for the notary to have the voter sign the Application and swear to it and then the notary would acknowledge the oath. On the same occasion the voter would mark his ballot, place it in the envelope, sign the affidavit contained in the envelope and have the notary acknowledge that affidavit. In a large number of instances the Certificate of Attesting Witness was not signed. The notary then returned the absentee ballot envelope with the ballot contained in it and the Application to the registrar's office rather than the voter returning it by mail as required. There is no proof that any of the voters were improperly influenced in the marking of their ballots.

Accordingly, all but a few of the 115 absentee ballots cast were subject to challenge because of the failure to follow the proper procedures for obtaining and casting those ballots. In addition, 58 of the ballots were invalid for failure to have the Certificate of Attesting Witness filled out on the back of the absentee ballot envelopes.

On December 13, 1983, prior to the time that the polls closed at 6:00 P.M., Manuel Welch gathered several poll watchers to go to the Dentville and Carpenter precincts in District 4 to challenge absentee ballots. Welch and his black attorney, Carroll Rhodes, went to the Carpenter precinct. Tommy Wheeler, a black man, and other Blacks went to the Dentville precinct. Welch had given each of his black poll watchers a written authorization granting them the power to act as poll watchers on his behalf as provided by Section 23–1–41.

When Welch and Rhodes arrived at the Carpenter precinct prior to 6:00 P.M., the time the polls officially closed, the absentee ballots had been removed from their envelopes and had been piled together and separated from their envelopes and from the applications for absentee ballots. This obviously left no way in which individual absentee ballots could be examined for compliance with the laws of the State of Mississippi and accordingly Rhodes thereupon challenged all of the absentee ballots cast in the Carpenter precinct. The election officials counted the ballots anyway.

Tommy Wheeler and other black poll watchers for Welch arrived at the Dentville precinct prior to the close of the election. After the polls had closed at 6:00 P.M. the election officials began to tabulate the absentee ballots. Wheeler, as Welch's poll watcher, challenged the absentee ballots, ballot by ballot, until a disturbance was caused by a white person who was in the polling room but who had no official connection with the election. Someone telephoned the Sheriff's department and shortly thereafter black Deputy Sheriff, Burnell Ramsey, arrived. Deputy Ramsey investigated the situation. During the investigation he and Wheeler were advised, first by the incumbent W.E. Hood and then by Jack Singleton, a member of the Democratic Executive Committee, who were both present, that Wheeler could challenge the absentee ballots the next day at the Copiah County Courthouse when the election returns were being canvassed by the Democratic Executive Committee. Deputy Ramsey asked Wheeler and the other Welch poll watchers to step back from the tables where the poll workers were counting the votes, which they did. Wheeler stated that he was challenging all of the remaining absentee ballots. The Election Officials at Dentville counted all of the absentee ballots together with the other ballots.

The official election returns indicate that W.E. Hood received a total of 877 votes, of which 111 were by absentee ballots cast at the following precincts: Dentville—54; Carpenter—31; Crystal Springs South—24; Crystal Springs North—1. Forty-nine of the absentee ballots cast for W.E. Hood at the Dentville precinct did not have the Certificate of Attesting Witness filled out on the back of the absentee envelopes. Nine of the absentee ballots cast for W.E. Hood at the Carpenter precinct did not have the Certificate of Attesting Witness filled out on the back of the absentee ballot envelopes.

Federal Poll Watchers and officials appointed under the Voting Rights Act of 1965 were present during the election and during the counting and canvassing of the ballots.

The day following the election, December 14, 1983, certain members of the Copiah County Democratic Executive Committee met to canvass the election boxes and certify winners of the races. Five or six members of the Executive Committee were present, along with a representative from the United States Department of Justice. As they canvassed the boxes, John T. Armstrong, Jr., Chairman of the Executive Committee and an attorney, noted that forty-nine of the absentee ballots cast at the Dentville Precinct and nine of the ballots cast at the Carpenter Precinct were invalid because of the failure to complete the Certificate of Attesting Witness. If these ballots had been thrown out by the canvassing sub-committee, Welch would have been declared the Democratic party nominee. However, Mr. Armstrong stated in the meeting that the certification of Welch as the nominee was "too big for them to handle" and the decision was made to refer the matter to the entire Democratic Executive Committee.

The Democratic Executive Committee met on December 17, 1983, to consider a challenge presented by Earnest Thomas, a candidate for supervisor in the District One race. The Committee heard arguments from the attorneys for Mr. Thomas and then retired into executive session to consider Mr. Thomas' challenge. While in executive session the Committee certified W.E. Hood as the Democratic Nominee in the District Four race. Welch then filed a challenge to the second primary election.

Welch never filed an election contest in state court.[3]

The Democratic Executive Committee did meet on December 28, 1983, to consider Welch's challenge to the second primary election for the District Four Supervisor's race. Mr. Armstrong informed the Committee that he had requested a ruling from the State Attorney's office and had been advised that Welch's challenge was a legal matter and should be left to the Court. The Democratic Executive Committee voted to reject Welch's challenge and to certify W.E. Hood as the Democratic nominee.

There was direct evidence of fraud in the instances of six electors of the Crystal Springs South Precinct in District Four. Applications for absentee ballots were signed for Patricia Tillman, Carrie Newell (in the name of Carolyn Tillman, her former maiden name), Mary Jane Tillman, Sandra Faye Tillman, Ora Lee Tillman and O.C. Tillman. Carrie Tillman and Mary Jane Tillman both testified that they had, in fact, signed those Applications. However, each of the six specifically testified that they had not signed the Affidavit on the absentee ballot envelope and that each would have voted for Manuel Welch rather than W.E. Hood. The testimony showed that one Sara "Fat Ivory" Johnson had brought the six applications to the Tillman home. Each of the Applications and the affidavits on the absentee ballot envelopes were acknowledged by Richard Belding as the notary public. Each of the applications, except that of Sandra Faye Tillman, shows that it was delivered·by the registrar to Ricky Smith. The Court is convinced by clear and convincing evidence that fraud was perpetrated on these six voters and because of the aforementioned connection between Richard Belding and Defendant W.E. Hood and Ricky Smith and

W.E. Hood that that fraud can be directly connected to W.E. Hood. Four of these fraudulent absentee ballots were actually counted, each having been counted for W.E. Hood. The absentee ballots of Sandra Faye Tillman and Ora Lee Tillman were not counted because those two persons actually went to the polls on election day and voted in person. When the envelopes containing these two ballots were opened in Court, it was found that both had been cast for W.E. Hood.

Mildred Ferguson, the registrar, testifying through deposition since she has died while this case has been pending, testified that she had, in fact, handled the applications and ballots in the manner which the rest of the proof showed and, in fact, had kept very careful records as to whom the applications and ballots had been delivered. Mrs. Robbie Tyson, the deputy-registrar, testified that she and the other deputy-registrar had handled the absentee ballots in this fashion in this election because it was the same way that they had always handled them. Denise Strong, a notary public who notarized a number of the applications and envelopes, testified that she had called the registrar for instructions as to completing the absentee ballot envelopes and had been informed by Mrs. Ferguson that it was not necessary for her to fill out the Certificate of Attesting Witness. Mrs. Ferguson further testified that she had refused to hand any applications directly to W.E. Hood because he was a candidate. Because of these facts, because of the straightforward manner in which these witnesses testified, and because it would make no sense for the registrar to intentionally instruct Mrs. Strong in an improper manner if she were in collusion with the Defendant, W.E. Hood, it is this Court's con-

---

**3.** Section 23–3–45 allows the filing of an election contest by sworn petition in the circuit court of the county wherein the irregularities are charged to have occurred. A state circuit judge or chancellor of a district other than that which embraces the county involved in the contest is to be forthwith designated by the chief justice of the Mississippi Supreme Court to hear and determine the contest at the earliest possible date. Section 23–3–47. The election com-

missioners of the county shall sit with the designated judge during the *de novo* hearing as advisors and assistants in making counts, calculations and inspections but the judge's opinion shall control as to both the facts and the law. The judge shall dictate his findings into the record together with any dissent of any commissioner. Section 23–3–49. An appeal may be taken on an expedited basis to the State Supreme Court. Section 23–3–51.

clusion that the registrar's office did not knowingly and intentionally participate in any fraudulent activity. It is clear that the procedures used by the registrar's office were contrary to the laws of the State of Mississippi. It is incomprehensible to this Court as to why the registrar did not herself read the absentee ballot provisions or seek instruction from a knowledgeable attorney when it became apparent that a large number of absentee ballots were being requested. On the other hand, if she and her office had been intentionally active in seeking to defraud the black voters of Copiah County and the candidate Welch, they would have at least tried to learn the proper mechanics of the absentee voter provisions and comply with them.

The Court was further impressed with the straightforward manner in which the notary public Denise Strong testified. It is clear that she was attempting to render a service to those voters who wished to vote by absentee ballot and by going so far as to seek assistance from the registrar's office was trying to help in a proper manner.

Dorothy Inabnet and Avis Strong, both poll workers at the Dentville Precinct, both white, were straightforward in their testimony as to what had happened at the time the absentee ballots were challenged at that precinct. They had not been adequately trained as poll workers and did not know what the provisions of law were regarding the challenges to absentee ballots. They relied upon the advice of Jack Singleton, an election commissioner who happened to be there, that the ballots could be challenged the next day when the boxes were canvassed at the courthouse and accordingly proceeded with a count of the ballots. As stated above, Section 23–3–25 does state that the failure to challenge does not preclude a candidate from later showing a vote has been improperly counted. It was clear that Tommy Wheeler, the authorized poll watcher for Welch, was treated with consideration and courtesy by the official poll workers as he was making the challenges on behalf of Welch. The poll workers at the Dentville Precinct did not knowingly act improperly.

The canvassing committee of the Democratic Executive Committee obviously reached a conclusion about the invalidity of enough ballots so that the election would be given to Welch. However, they did not have the courage to make that decision as it should have been made and, accordingly, passed that decision to the full Democratic Executive Committee. That full Committee, consisting of both black and white members, considered the matter, relied in part on the questionable advise of the State Attorney General's office, and voted to deny Welch's challenge and to certify W.E. Hood as the Democratic nominee. This Court has no evidence before it from which it can conclude that the Democratic Executive Committee, either as a full committee or as a canvassing committee, intentionally and purposely violated any of the rights of any of the Plaintiffs.

## CONCLUSIONS OF LAW

This action was brought pursuant to 42 U.S.C. Section 1983 and the Voting Rights Act of 1965, 42 U.S.C. § 1973. The framework established by the Constitution of the United States leaves the conduct of state elections to the states. *See Oregon v. Mitchell,* 400 U.S. 112, 124–29, 91 S.Ct. 260, 264–67, 27 L.Ed.2d 272 (1970). The exceptions to this involve constitutional or federal statutory rights. As the United States Court of Appeals for the Fifth Circuit stated in *Gamza v. Aguirre,* 619 F.2d 449 (5th Cir.1980), "[s]ection 1983 did not create a delictual action for the torts of state officials, ..., and it did not authorize federal courts to be state election monitors." *Id.* at 453–54.

■ **Voting Rights Act.** The question before this Court regarding the Voting Rights Act is whether the actions of W.E. Hood and his associates placed in the context of the use by the Circuit Clerk of improper absentee ballot procedures and the actions of the Democratic Executive Committee combined to constitute a violation of Section 2 of the Voting Rights Act as amended in 1982. 42 U.S.C. § 1973(a). The right to vote includes the right to have

ones ballot counted. This includes the right to not have ones ballot diluted by the casting of illegal ballots or weighting of one ballot more than another. *Reynolds v. Sims,* 377 U.S. 533, 554–55, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506 (1964).

 Because no law is being attacked as having the effect of diluting black voting strength, the question becomes whether the actions of the individuals at issue in this case constitute a "standard, practice, or procedure" within the meaning of Section 2. This is not a case in which a Section 5 allegation has been made; namely, that the county "changed" its procedures without preclearance from the Justice Department. *See United States v. Saint Landry Parish School Board,* 601 F.2d 859, 866 (5th Cir.1979) (poll commissioner's actions in assisting voters are voting practices or procedures within the meaning of § 1973). This Court has found that the acts of the Circuit Clerk were pursuant to a long established policy of her office which misread and misapplied the Mississippi absentee ballot procedure. This erroneous application was not in any way altered for this election in order to deny Blacks their vote or to dilute black voting strength. This error was neutral in its effect on race and equally applied to all absentee voters. The actions of the supporters of W.E. Hood and Mr. Hood himself were no more than a concentrated effort to re-elect an incumbent at all costs, including fraud. While irregularities are apparent, these do not constitute "episodic" events in the sense that they are part of an over-all scheme or pattern. Rather, these were isolated and singular incidences of misconduct and improper administration. The misapplication of the Mississippi absentee balloting procedure in and of itself did not operate so as to dilute black voting strength. This error on the part of the Circuit Clerk was due to ignorance of the law and was not a conspiracy; her actions did not constitute a practice which had the effect of diluting black voting strength.

In accordance with the mandate of Congress as embodied in the 1982 Amendments to Section 2 of the Voting Rights Act this Court finds that the confluence of the above described events neither operated to deny Welch an equal opportunity to win the election nor did it work to deny the minority voters the opportunity to elect the candidate of their choice. *See Senate Comm. on the Judiciary, Voting Rights Act Amendments of 1982,* S.Rep. No. 97–417, 97th Cong. 2nd Sess. 30, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* 177, 207, 08 (episodic rather than structural barriers).

In summary, these isolated actions on the parts of the individuals and the incumbent, W.E. Hood, as well as the Circuit Clerk are simply not the type of "standard, practice, or procedure" which was contemplated as the evil at which the Voting Rights Act was aimed. Under Mississippi law it is clear that at least 58 of the absentee ballots counted for Hood are invalid, a number sufficient to allow the state courts to certify Welch as the winner of the election. *Fouche v. Ragland,* 424 So.2d 559, 561 (Miss.1982) (both affidavit and certificate of attesting witness *must* be signed for ballot to be valid); *Noxubee County Democratic Executive Committee v. Russell,* 443 So.2d 1191 (Miss.1983) (judge in election contest may designate the person to be certified as the winner of the election). Of course, this Court may not sit to determine the winner; it is limited to determining whether the federal rights have been trampled by the Defendants such that the election must be set aside. *Hubbard v. Ammerman,* 465 F.2d 1169, 1179 (5th Cir. 1972).

Accordingly, this Court finds after a full hearing of this case that no violation of Section 2 of the Voting Rights Act has been committed. This is merely a question of how state election laws are administered which should have been addressed to the state courts. There is every indication that those courts would uphold the election laws of the State of Mississippi.

 **Constitutional Violations and Section 1983 Claims.** The United States Court of Appeals for the Fifth Circuit has repeatedly held that federal court is not the appropriate forum for "garden variety" election contests. *Duncan v. Poythress,*

657 F.2d 691, 701 (5th Cir.1981). The first inquiry in this case must necessarily be whether particular conduct rises to a constitutional deprivation instead of an inferior legal wrong. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Mere negligence in the execution of state elections does not constitute a Section 1983 violation without more. *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir.1980). This case does not present the outrageous or egregious conduct which strikes at the very heart of the fairness of an election such as was presented to the court in *Bell v. Southwell*, 376 F.2d 659 (5th Cir.1967). The facts of the case before this Court are very similar to those in *Hubbard v. Ammerman*, 465 F.2d 1169 (5th Cir.1972) (action based on Section 1983 and Voting Rights Act; court held no jurisdiction). Consistent with this line of authority this Court has held the hearing in order to determine whether it has jurisdiction to intervene in the state election procedure. *See Johnson v. Hood*, 430 F.2d 610 (5th Cir.1970).

As stated above with reference to Section 2 of the Voting Rights Act, this case presents isolated incidences of fraud as well as improper or negligent implementation of the election procedures. This case does not involve gross, spectacular or wholly indefensible discrimination against Blacks; nor do the facts of this case evidence the use of violence and corruption on the part of state officials to control elections. *Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir.1980).

The only direct proof of fraud was six votes which were cast by one other than the qualified voter. This does not rise to the level of a constitutional deprivation sufficient to justify the setting aside of this election. *Gamza v. Aguirre*, 619 F.2d at 453–54. *Saxon v. Fielding*, 614 F.2d 78 (5th Cir.1980) (voting violations not serious enough to justify federal intervention). *See also Hennings v. Grafton*, 523 F.2d 861 (7th Cir.1975) (malfunctioning of electronic device not constitutional deprivation under Section 1983). Mississippi has a procedure for filing election contests. *Miss. Code Ann.* § 23-3-45 (1972). In any case,

the only remedy which this Court would be competent to grant would be the voiding of this election, not the declaration of the winner. *See Hubbard v. Ammerman*, 465 F.2d 1169, 1177 (5th Cir.1972). This Court has reached the merits of the claim under Section 2 because it would appear inappropriate to dismiss for lack of jurisdiction as this Court has done with reference to the Section 1983 and constitutional claims. *See Toney v. White*, 488 F.2d 310 (5th Cir. 1973).

**Conclusion.** It appears to this Court that the remedy of the Plaintiffs in this case was in state court, *Johnson v. Hood*, 430 F.2d 610, 613 (5th Cir.1970). There is no violation of Section 2 was found after a full hearing on the merits. Additionally, this Court lacks jurisdiction under Section 1983, there being no constitutional deprivation and no circumstances sufficient to justify federal intervention in the state electoral process.

Because of the result this Court has reached it is unnecessary to rule on the pending Motions for Summary Judgment or the Motion to Certify this as a class action. The Motion to Consolidate this case with *Thomas v. McKenzie*, C.A. No. J84–0031(B) was properly denied. These two cases present distinct factual predicates.

In accordance with the above order and memorandum opinion the relief requested by the Plaintiffs is denied and this case is dismissed with prejudice. A judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.