Manuel **WELCH**, et al.,
**Plaintiffs-Appellants,**

v.

Lillie V. **McKENZIE**, et al.,
**Defendants-Appellees.**

No. 84–4562.

United States Court of Appeals,
Fifth Circuit.

July 22, 1985.

**1312**

Carroll Rhodes and James D. Shannon, Hazlehurst, Miss., for plaintiff-appellants.

Richard E. Stratton, III, Daniel H. Fairly, Brookhaven, Miss., and Henley, Lotterhos & Henley, H. Brand Henley, Jr., James W. Henley, Jackson, Miss., for defendants-appellees.

Before TATE and HIGGINBOTHAM, Circuit Judges, and CASSIBRY,* District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Manuel Welch, an unsuccessful black candidate for a supervisor's post in Copiah County, Mississippi, and three black voters appeal an adverse judgment entered after a bench trial of their suit under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments. They argue that irregularities, errors, and fraud in the distribution and counting of absentee ballots, resulting in a narrow victory for the white incumbent, either were racially motivated or had the effect of diluting the votes of black voters and denying Welch the opportunity to be elected. The district court, in a careful written opinion, 592 F.Supp. 1549 (S.D.Miss.1984), agreed that numerous violations of Mississippi's election laws had occurred, but found no evidence that racially discriminatory intent underlay those infractions, or that blacks, as opposed to Welch supporters, suffered dilution of their votes.

"[R]eview of factual findings under the clearly-erroneous standard—with its deference to the trier of fact—is the rule, not the exception." *Anderson v. City of Bessemer City,* —— U.S. ——, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Because the district court's findings of fact were not clearly erroneous, and because those found facts do not demonstrate a Section 2 or constitutional violation, we affirm.

I

On October 20, 1983, the District Court for the Southern District of Mississippi approved a redistricting plan for the four supervisors' districts of Copiah County, Mississippi. Under the plan, a first primary was to be held on November 29, 1983, with a runoff primary, if necessary, set for December 13, and the general election scheduled on December 27. Manuel Welch filed as a candidate for supervisor in District 4. In the first primary, Welch and the incumbent supervisor, W.E. Hood, led the field and qualified for the runoff primary.

In the runoff, Hood received 877 votes to Welch's 858. One hundred fifteen of the votes were cast by absentee ballot, a number well in excess of the number of absentee votes previously cast in any Copiah County election. Hood received 111 of the absentee votes to Welch's 4.

The district court found that virtually all of the absentee ballots cast in the runoff were either distributed in violation of Mississippi law, marked improperly, or both. Under Mississippi's election statutes, a voter can obtain an absentee ballot in only two ways: appearing at the county registrar's office in person and voting early, or requesting a ballot by mail and mailing it back. Here, however, before the runoff primary, Hood campaign workers went to the registrar's office and presented lists of voters ostensibly desiring absentee ballots. The registrar filled out an application for an absentee ballot in each voter's name, and gave the applications and absentee ballots to the campaign workers. The campaigners took each packet to a voter's home, where the voter, in the presence of a notary, both signed the application and marked the ballot itself. The notaries re-

---

turned the ballots to the registrar's office. Significantly, one of the notaries, Richard Belding, testified without contradiction that about half of the voters who voted in this manner were black, and about half were white.

Mississippi law further requires that the envelopes in which absentee ballots are sealed be imprinted with a voter's affidavit and a certificate of an attesting witness. After voting, the voter is to seal the ballot in the envelope, sign his name across the flap, sign the affidavit, have his affidavit notarized, and have the attesting witness sign. Fifty-eight of the ballots cast for Hood lacked an attesting witness's signature.

On election night, Welch went to the Carpenter precinct before the polls closed, and discovered that all absentee ballots cast there had been separated from their envelopes, another violation of Mississippi election law. Welch challenged all of those absentee ballots. Welch designated Tommy Wheeler, a black man, as his poll watcher at the Dentville precinct. As officials there began to count absentee ballots, Wheeler challenged each one individually. Bryant Channell, a white man with no official duty, told Wheeler to "get the hell out of there," and was himself told to shut up by election officials. At that point, Hood appeared and stated that Wheeler should challenge the ballots the next day at the county courthouse. After further discussion and the arrival of a black deputy sheriff, Wheeler agreed to challenge all remaining absentee ballots as a group.

The next day, December 14, six members of the Copiah County Democratic Executive Committee, along with an observer from the U.S. Department of Justice, met to formally canvass the election boxes. The committee chairman, John Armstrong, testified without dispute that three of the six committee members were black and three were white. At the meeting, Armstrong stated that 58 of the absentee ballots were invalid for lack of a witness's signature, but then said that the rejection of those ballots, which would have made

Welch the winner, was a decision "too big for them to handle." Although they had never before done so, the committee members voted to defer the decision until the next regularly scheduled meeting of the full committee on December 17.

The Democratic Executive Committee was, at the time, composed of 21 whites and 14 blacks. Twenty-nine members were present at the December 17 meeting. Armstrong asked the committee to vote for one of three options: to call a new election, to certify Hood as the winner, or to reject the questioned absentee ballots and certify Welch as the winner. The proposed questions received 3, 19 and 5 favorable votes respectively, and Hood was certified as the winner. At trial, Armstrong testified, again without dispute:

My memory is that the three people who voted for a new election were all white, and that the nineteen votes were pretty even, black and white, and that the third question of five votes for Welch—I can't remember, there may have been one—like four black and one white, something like that. It's hard to be accurate on that, I might add.

Welch challenged the certification at a second meeting of the full committee on December 28. Counsel for both Welch and Hood were given time to present arguments to the committee. Hood's counsel, Richard Stratton, said that the dispute should be resolved in court. Chairman Armstrong told the committee that a representative of the Mississippi Attorney General's office had recommended that the committee uphold Hood's victory "and let the courts decide these legal questions." The committee then voted 18 to 7 to reject Welch's challenge. Bennie Lewis, a black committee member, testified that "two whites and five blacks" voted in Welch's favor; Armstrong testified that "at least four" whites supported Welch.

Welch did not challenge the election result in the Mississippi courts, feeling that he would not get "a fair shake" there, a fear that was not realized. Instead, he and three voters sued in federal court, alleging

vote dilution under § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and discrimination and impairment of the right to vote under the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983.

The district court, in addition to making the above findings, found that six of the absentee votes for Hood had been fraudulently obtained from one family of black voters, the Tillmans, and had been counted contrary to those voters' intent to vote for Welch. The court determined that neither the county registrar and her staff nor the Democratic Executive Committee had intended to discriminate against Welch or black voters. Specifically, the court found that the registrar's errors were "pursuant to a long established policy" of misinterpretation and ignorance of the election laws, and that the Executive Committee's failure to certify Welch as the winner resulted from their lack of "courage" and the "questionable advice" of the state attorney general's office. 592 F.Supp. at 1557, 1558.

The district court concluded that the "confluence of the above described events neither operated to deny Welch an equal opportunity to win the election nor did it work to deny the minority voters the opportunity to elect the candidate of their choice," and rejected the Section 2 claim on its merits. *Id.* at 1558. Because it found no "gross" or "spectacular" racial discrimination or other egregious election abuses, it held that it lacked jurisdiction over the constitutional claims. The court's opinion makes clear that with respect to both the statutory and constitutional claims, it viewed the case as a "garden variety" election dispute that should have been resolved in state court: "There is every indication that those [state] courts would uphold the election laws of the State of Mississippi." 592 F.Supp. at 1558.

The district court's prediction that the state courts would do their job proved accu-

rate. On May 22, 1985, a Copiah County jury convicted Hood of conspiracy to commit voter fraud, a felony under Mississippi law. On May 24, the Copiah County circuit judge removed Hood from office and appointed a temporary successor to fill Hood's position until November of this year, when Mississippi law mandates a special election.[1]

## II

### -1-

■ The plaintiffs, in their reply brief, list several district court findings of fact that they claim are clearly erroneous. First, in response to the court's finding that Hood's campaign workers did not improperly influence absentee voters in the marking of their ballots, 592 F.Supp. at 1554, the plaintiffs point to the court's recognition that fraudulent ballots had been cast in the names of the Tillmans. This episode is more accurately characterized as surreptitious ballot-box stuffing than as the coercion of voters that the court was referring to. Hood's campaign workers testified that they did not tell absentee voters who to vote for. Welch offered no contrary evidence, and the district court credited the Hood workers' testimony. This finding of fact was not clearly erroneous.

Next, plaintiffs contest the district court's finding that the registrar and her staff did not intend to discriminate against black voters. Despite the district court's finding in the previous redistricting case that the registrar had shown racial prejudice in the past in dealing with black voter registrants, the court accepted her testimony and that of her staff that they thought they were merely performing their official duties in distributing absentee ballots to Hood's supporters, and that they did not

---

**1.** The appellees suggest that these events have mooted this action. Invalidation of the election did not, however, so exhaust the remedial range of the complaint as to fully end the controversy. *See* 28 U.S.C. § 1344; *Hubbard v. Ammerman,* 465 F.2d 1169, 1180 (5th Cir.1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973); *Johnson v. Stevenson,* 170 F.2d 108, 110 (5th Cir.1948), *cert. denied,* 336 U.S. 904, 69 S.Ct. 491, 93 L.Ed. 1069 (1949).

know that they were violating state election laws by doing so.

Welch further argues that the Democratic Executive Committee's acts show that it denied his challenges because of his race. Instead, the district court found credible the testimony of Armstrong, who essentially testified that the Committee was washing its hands of the election dispute and leaving the matter to be resolved in court.

Finally, the plaintiffs attack as clearly erroneous the district court's findings that Hood's supporters distributed ballots to persons who had expressed a desire to vote absentee, as opposed to the campaigners' going door-to-door to solicit absentee votes, and that the campaign workers who prepared the lists of absentee voters themselves took the ballot applications to voters' homes, as opposed to Hood doing so. The plaintiffs' version of these facts, though, even if true, only adds to the stack of Hood's state-law election violations, and is no more of a basis for finding a racial component to this election than the facts as found by the district court.

In upholding the district court's findings that the defendants did not intend to discriminate on the basis of race, we necessarily affirm the court's dismissal of the plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment. *See Rogers v. Lodge,* 458 U.S. 613, 616–19, 102 S.Ct. 3272, 3274–76, 73 L.Ed.2d 1012 (1982). Because, as in *Jones v. City of Lubbock,* 727 F.2d 364, 370 (5th Cir.1984), the parties have assumed that proof of discriminatory intent is required under the Fifteenth Amendment, we affirm the dismissal of the Fifteenth Amendment claim as well.

–2–

■ The plaintiffs assert that even the facts as found by the District Court show that the acts of the registrar and the Democratic Executive Committee resulted in dilution of black voters' ballots in violation of Section 2 of the Voting Rights Act.[2] As the district court recognized, Congress, in amending Section 2 in 1982, made it clear that the statute covers episodic practices, as well as structural barriers, that result in discrimination in voting. The relevant inquiry is "whether, in the particular situation, the [episodic] practice operated to deny the minority plaintiff an equal opportunity to participate and to elect candidates of their [sic] choice." S.Rep. No. 97–417, 97th Cong., 2d Sess. 30, reprinted in 1982 U.S.Code Cong. & Admin.News 177, 207.

In a footnote, the Senate Report cited *Brown v. Post,* 279 F.Supp. 60 (W.D.La. 1968) and *Toney v. White,* 488 F.2d 310 (5th Cir.1973) (en banc) as examples of episodic Section 2 violations. In *Brown,* the clerk of Madison Parish, Louisiana made absentee ballots available to various groups of white voters without making a corresponding effort to distribute absentee ballots to blacks. In *Toney,* the registrar of the same parish misapplied Louisiana election statutes in purging voter lists, resulting in the disenfranchisement of many more blacks than whites. In both cases, relief was granted under Section 2 despite

**2.** Section 2, as amended, is codified as 42 U.S.C. § 1973:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

findings of no discriminatory intent on the part of election officials.

In *Hubbard v. Ammerman,* 465 F.2d 1169 (5th Cir.1972), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973), by contrast, this court rejected a Voting Rights Act suit asserting that the winning candidate had stuffed the ballot box with spurious ballots on behalf of illiterate and mentally incompetent black voters. We found it "obvious that these ballots were due to be thrown out, whatever the race of the individual who had cast them," and viewed the ballot-stuffing as merely possible state-law fraud. 465 F.2d at 1181. Finding no other evidence of racial discrimination, we ordered the dismissal of the federal complaint.

If the registrar in this case had supplied absentee ballots only for white voters, or if the Democratic Executive Committee had been an all-white body voting to certify Hood as the winner despite the number of obviously invalid votes cast for him, the district court's finding of no Section 2 violation might have been sorely taxed. *See Goodloe v. Madison County Board of Election Commissioners,* 610 F.Supp. 240 (S.D.Miss.1985) (Barbour, J.) (finding Section 2 violation where election board rejected 250 ballots cast *by black voters* after only 4 had been shown to be invalid). As the record undisputedly shows, though, the election-law errors by the registrar and the Executive Committee resulted in the counting of Hood ballots cast by both black and white voters. The committee members who voted to accept those ballots were of both races, as were those who voted to reject them.

The plaintiffs' theory, as reflected in their arguments to the district court, is that the votes cast by black absentee voters and black committee members were the product of white coercion. As plaintiffs' counsel urged below:

> Your Honor, we're saying that we will propose to show that the blacks that did have absentee ballots available or the ones that did vote by absentee ballot where the ballot might not have been

illegal, that the fact that if a white incumbent supervisor would go by the house and ask them to vote by absentee ballot their low socio-economic status would—they would probably be intimidated by that fact and that would affect their ability to effectively make an independent decision as to who they might vote for.

Similarly, Welch testified that he believed that the Executive Committee members did not vote for him because they feared retaliation by Hood. While this scenario is not implausible, the plaintiffs failed to persuade the district court. No witnesses testified that they or the black voting community so feared Hood that they felt compelled to accept his invitation to vote absentee and to vote for him. The district court refused to infer intimidation and we cannot find that conclusion to be clearly erroneous.

The only other act on this record that might constitute dilution of black votes is the fraud committed against the Tillmans. Although these minority plaintiffs were denied an equal opportunity to elect their chosen candidate, the fraudulent acts causing the deprivation were committed by Hood and his supporters, not by the county registrar or the Executive Committee. *See* 592 F.Supp. at 1556. The district court found as facts that the election irregularities in this case were "isolated and singular incidences," and that the registrar was not involved in any conspiracy. *Id.* at 1558. These findings that no official actor bore responsibility for the Tillman fraud are not clearly erroneous. Because Section 2 only affords redress for voting practices "imposed or applied by any State or political subdivision," Hood's chicanery is not a Voting Rights Act infringement.

On the facts as found by the district court, then, we are left with a case of election fraud that favored a white candidate over a black one. Without racial motivation or state-created impairment of black votes, there was no violation of Section 2 of the Voting Rights Act. Otherwise stated, stolen elections in which the losing candi-

date was black are, while decidedly suspicious, not necessarily violations of the Voting Rights Act or the Constitution. There is a place for state election laws to operate. Given the findings of the trial court, this case fits there.

–3–

■ The plaintiffs' last contention is that the defendants' acts rendered the electoral process so deficient as to violate the Due Process Clause of the Fourteenth Amendment. In other cases raising such claims, we have distinguished "garden variety" election disputes, which do not rise to the level of constitutional deprivation, from suits "implicat[ing] the very integrity of the electoral process," which are constitutionally cognizable. *Duncan v. Poythress,* 657 F.2d 691, 701, 703 (5th Cir.1981), *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982); *Gamza v. Aguirre,* 619 F.2d 449 (5th Cir.1980). The *Duncan* court, 657 F.2d at 703, approvingly quoted *Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir.1978):

> If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 may be in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots. . . .

*Duncan* found a due process violation in Georgia's total abrogation of a statutorily-mandated special election; *Griffin* found one in Rhode Island's distribution of absentee ballots in a primary race followed by a state court decision voiding all absentee ballots cast. *Gamza* reflects the more typical result: even though votes inadvertently counted incorrectly threw an election to the wrong candidate, this court refused to intervene. Results similar to *Gamza* were reached in *Hubbard v. Ammerman, supra; Johnson v. Hood,* 430 F.2d 610 (5th Cir.1970); *Pettengill v. Putnam County R–1 School District,* 472 F.2d 121 (8th Cir. 1973); and *Powell v. Power,* 436 F.2d 84 (2d Cir.1970). Notably, no racial discrimination was shown in *Gamza, Johnson, Pettengill,* or *Powell.*

Because we have upheld the district court's findings that no racially discriminatory purpose or effect was present here, we are left with an "ordinary dispute over the counting and marking of ballots," involving complaints about missing signatures, ballots that should have been mailed rather than hand-delivered, and six fraudulent votes. As Judge Rubin explained in *Gamza,* such claims of infringement of voting rights are not actionable in federal court because of our federal system's recognition that states are primarily responsible for regulating their own elections. 619 F.2d at 453–54. The district court correctly dismissed the plaintiffs' due process claims of denial of the right to vote.

The judgment of the district court is AFFIRMED.