**Marvin GAMZA et al., Plaintiffs-Appellees,**

v.

**Arturo R. AGUIRRE, Defendant-Appellant,**

**Harold Wiggs, President of the Board of Trustees of the El Paso Independent School District, Defendant,**

**Bruce Faulkner, Director of the El Paso County Election Commission, and T. Udell Moore, County Judge of El Paso County, Texas, Defendants-Appellants.**

No. 78–3041.

United States Court of Appeals, Fifth Circuit.

June 19, 1980.

---

George N. Rodriguez, Jr., County Atty., Craig A. Patton, El Paso, Tex., for Moore.

Arturo R. Aguirre, pro se.

Raymond C. Caballero, El Paso, Tex., for defendant-appellant.

Malcolm McGregor, Harry Tom Peterson, El Paso, Tex., for plaintiffs-appellees.

Before DYER, RUBIN and POLITZ, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A candidate for the school board of a Texas independent school district and four of his supporters contend they are entitled to relief in federal court under section 1983 because the election votes were improperly counted and, as a result, the candidate's opponent was improperly declared to be the winner. The district judge concluded both that he had jurisdiction over the action and that the candidate seeking federal relief had been denied office by acts involving "*scienter* bad faith and deliberate disregard of a state court order." He ordered the candidate who had been declared loser installed as a member of the Board of Trustees of the school board, in place of his opponent, the declared winner. Because the evidence does not establish a deprivation of federal constitutional rights, we reverse.

## I. *Facts*

Marvin Gamza was one of five candidates for election to the Board of Trustees of the El Paso Independent School District. He and Arturo Aguirre led in the primary, and a run-off election was held on April 29, 1978. At a meeting of the Board of Trustees on May 9, Aguirre was declared the winner by a margin of 67 votes, 1681 to 1614. At that time no question about the election was raised. However, Gamza later learned of possible irregularities in the election count that, if corrected, would result in a count in his favor. He, therefore, decided to challenge the election. He notified the district attorney of El Paso County, Texas of his concern about the election and the district attorney obtained a court order preserving the ballots and preventing their destruction. The district attorney investigat-

ed Gamza's complaints and concluded that they were not sufficient to warrant his taking action. The order preserving the ballots was renewed on August 15 and again on August 25. Nonetheless, all the ballots, except those from the three disputed precincts, were destroyed.

On August 28, 1978, Gamza sued Aguirre in state court seeking to be installed in the office held by Aguirre. As he had not given Aguirre notice of his challenge to the election within 30 days of the return,[1] the state court dismissed the suit on September 8, 1978. Meanwhile, Gamza and four individuals who had voted in the school board election had instituted this federal suit. Their complaint alleged that the miscount had resulted from "unintended error" and had denied them equal protection of the laws.

The irregularities arose because of errors in the management and programming of the voting machines and ballots used in the election. In the school board election, each voter is handed a card, or ballot, that is indecipherable by him. He inserts this card in a slot in a holding device, thus placing it beneath a fixed matrix containing the names of candidates. He inserts a stylus in a hole opposite the name of the candidate for whom he wishes to vote. The stylus perforates the ballot. The ballots are then placed in a machine which automatically counts them and tabulates the vote.

After the results were certified, Gamza claimed that there had been a miscount in three precincts because of the use of an incorrect matrix in the voting machines in those precincts. The matrix for the run-off showed the candidates as: 1. Aguirre; 2. Gamza. However, in the three disputed precincts, matrices from the first election were sent to the polling place where all three precincts voted. Those matrices showed the names of five candidates: 1.

Gamza; 2. Massello; 3. Aguirre; 4. Brotherton; 5. Calabrese. The election judge at the polling place discovered that five candidates were listed instead of only the two run-off candidates and telephoned the election commission. She was instructed to permit voters to vote by scratching out the other 3 names. Thus the machines in three precincts exposed the names of Gamza in position 1 and Aguirre in position 3. In all of the other precincts, Gamza was listed in position 2 and Aguirre in position 1. In the tabulation of the results, the Gamza votes from the 3 precincts where he was listed in position 1 were added to the other position 1 votes giving Aguirre credit for the votes cast for his opponent. Gamza was given credit for 3 votes cast in the blank position 2. 25 votes were not tabulated. If it is assumed that all of these were intended for Aguirre, a retabulation would have made Gamza the winner by 20 votes.

Presented with these facts alone, the district judge indicated an unwillingness to take jurisdiction. However, in the evidentiary hearing, he learned that the election ballots had been destroyed. Moreover, when a metal box supposedly containing the ballots from the three contested precincts was opened, only the ballots from one precinct were discovered. The district judge thereupon concluded that "the violation of plaintiffs' rights appears to involve scienter, bad faith and flagrant disregard for an existing court order in that the ballots . . . were destroyed contrary to said order" and ordered the relief now challenged: the installment of Gamza on the school board. The defendants sought a stay of that order. The district judge denied the stay and elaborated upon the reasons for his decision:

> The evidence was on the whole undisputed, though, there is a conflict in the evidence as to whom (sic) was responsible for the destruction of the contested bal-

---

1. Section 9.03 of the Texas Election Code (Vernon) provides:

    Any person intending to contest the election of anyone holding a certificate of election for any office mentioned in this law, shall, within thirty (30) days after the return day of election, give him a notice thereof in writing and deliver to him, his agent or attorney, a written statement of the ground on which such contestant relies to sustain such contest. By the "return day" is meant the day on which the votes cast in said election are counted and the official result thereof declared.

lots . . . . [T]he Court became convinced after a full hearing on the matter that while the initial error in the counting of the ballots of the election may have been innocent, the subsequent events resulted in an intentional deprivation of the civil rights of the voters and the candidate in the case.

Although the district court found that the defendants intentionally resisted and interfered with Gamza's attempts to challenge the election, there is no evidence that the initial error in setting up the matrices and the subsequent miscount of the ballots resulted from anything but entirely innocent human error. The question before us is whether either the innocent initial errors or the subsequent attempts to conceal that error justify the relief granted under section 1983.

## II.

█ In determining whether we have jurisdiction of claims based on section 1983, the full text of which is set forth in the margin,[2] we are reminded by *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979), first to determine whether the claimant has been deprived of a right secured by the Constitution and laws of the United States.[3] "Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377–78, 12 L.Ed.2d 506, 523 (1964). The Supreme Court has stated that qualified voters have not only a constitutional protected right to vote, *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), but also the concomitant right to have their votes counted, *Unit-

ed States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). These rights can neither be denied outright, *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), nor destroyed by alteration of ballots, *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368 (1941), nor diluted by ballot-box stuffing, *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944). *See also Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970).

These rulings stretched to their doctrinal bounds would appear to support the plaintiff's position that the failure to count their votes amounted to a constitutional deprivation. However, constitutional decision must not be confined merely to the logical development of the philosophy of prior decisions unfettered by other considerations. The functional structure embodied in the Constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by section 1983 must all be fully attended.

If the right to suffrage is to operate as "preservative of other basic civil and political rights," *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964), the court must be willing to intervene when the weight of some votes "is in a substantial fashion diluted when compared with votes" of others. *Id.* at 568, 84 S.Ct. at 1385, 12 L.Ed.2d at 531. A cause of action has been recognized when "wilful conduct . . . undermines the organic processes by which candidates are elected." *Hennings v. Grafton*, 523 F.2d 861, 864 (7th

---

2. Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
42 U.S.C. § 1983.

3. In the district court, but not in his brief to us, Gamza argued that seating Aguirre denied him of property without due process. The claim is evidently abandoned, as it, indeed, should be, for the Supreme Court has held that "unlawful denial by state action of a right to state political office is not a denial of a right of property or liberty secured by the due process clause." *Snowden v. Hughes*, 321 U.S. 1, 7, 64 S.Ct. 397, 400, 88 L.Ed. 497, 502 (1944).

Cir. 1975). In *Smith v. Cherry*, 489 F.2d 1098 (7th Cir. 1973), *cert. denied*, 417 U.S. 910, 94 S.Ct. 2607, 41 L.Ed.2d 214 (1974), the offering of a sham candidate to prevent another from winning the primary election was said to have "clearly debased the rights of all voters in the election. Such an abridgment of the right to vote is impermissible and evinces the sufficiency of this [section 1983] complaint." *Id.* at 1102. *See also Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970); *Shakman v. Democratic Organization of Cook County*, 435 F.2d 267 (7th Cir. 1970), *cert. denied*, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650 (1971).

The constitutional right established in *Reynolds v. Sims*, however, is not absolute and is properly limited by respect for the political and federal framework established by the Constitution. This framework leaves the conduct of state elections to the states. *See Oregon v. Mitchell*, 400 U.S. 112, 124–29, 91 S.Ct. 260, 265–67, 27 L.Ed.2d 272, 281–84 (1970). As *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), requires in tort cases, the determination that particular conduct constitutes a constitutional deprivation rather than a lesser legal wrong depends on the nature of the injury, whether it was inflicted intentionally or accidentally, whether it is part of pattern that erodes the democratic process or whether it is more akin to a negligent failure properly to carry out the state ordained electoral process and whether state officials have succumbed to "temptations to control . . . elections by violence and by corruption," *Ex parte Yarbrough*, 110 U.S. 651, 666, 4 S.Ct. 152, 159–60, 28 L.Ed. 274, 279 (1884).

■ The Supreme Court has recently made clear that the "right to vote" dis-

cussed in *Reynolds v. Sims* must be understood as a narrow substantive right, conferred by the equal protection clause, "of a person to vote on an equal basis with other voters." *City of Mobile v. Bolden*, —— U.S. ——, 100 S.Ct. 1490, 1506, 64 L.Ed.2d 47 (1980).[4] We must, therefore, recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause. *See, e. g., Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970). The unlawful administration by state officers of a non-discriminatory state law, "resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944).

■ The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a section 1983 gloss. *See Pettengill v. Putnam County R–1 School District*, 472 F.2d 121 (8th Cir. 1973); *Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978) (dictum). Section 1983 did not create a delictual action for the torts of state offi-

---

4. When voting cases involve elections to Congress, constitutional protection of the individual vote may also derive from Art. I, § 2 of the Constitution, which provides, in part, "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . ." *See also* U.S.Const. Amend. XVII. *See generally United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944); *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Some independent protection of voting rights is provided in other parts of the Constitution. *E. g.* U.S.Const. amend. XV, XIX, XXIV, XXVI.

cials, *see Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695–96, 61 L.Ed.2d 433 (1979), and it did not authorize federal courts to be state election monitors. For these reasons we have concluded that the denial of a nominee's right to a position on a ballot by an episodic election irregularity in a county primary election does not deprive his supporters of a federal constitutional right.[5] *See Hubbard v. Ammerman*, 465 F.2d 1169 (5th Cir. 1972), *cert. denied*, 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973).

### III.

■ Here there is neither charge nor evidence that Texas's electoral laws unconstitutionally diluted the vote of Gamza's supporters or that those laws operate in a discriminatory manner. The complaint contended only that an inadvertent error denied them equal protection. There was no allegation of intent to violate their constitutional rights or of deliberate deprivation of their right to vote. While the case proceeded precipitately to trial on the merits, and it is doubtful that the pleadings can be considered enlarged by the evidence presented, *see* Fed.R.Civ.P. 15(b), the record does not support the conclusion that the incorrect preparation of the matrices for three precincts resulted from aught but human error and the trial judge found no calculation in it. His conclusion was that the state court order not to destroy the ballots had been wilfully violated. This was not sufficient even to amount to contempt of the federal court. Certainly it was not sufficient basis to set aside the election that preceded it. Even if the attempt to cover-up what had happened was malign, there was neither allegation nor evidence that the ballot error was deliberate. In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters or motivated by a desire to subvert the right of the voters to choose their school board representative, we cannot conclude that the error constituted a denial of equal protection of the laws.

Aggrieved electors and their candidates are not left remediless. Every state has a procedure for election challenges. *See generally* Federal Election Commission, Contested Elections and Recounts, Vols. II & III (1978). Absent abuse sufficient to rise to constitutional impairment, the "power to control the disposition of contests over elections to . . . state and local offices" is conferred by the Constitution on the states. *See Hubbard v. Ammerman,* 465 F.2d 1169, 1176 (5th Cir. 1972), *cert. denied*, 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973); *cf. Roundebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972).[6]

For these reasons, the judgment is REVERSED and the case is REMANDED with instructions to dismiss the complaint.

---

**5.** We need express no opinion whether or under what circumstances section 1983 would give a right of action in damages for an individual who had been deprived of his personal right to vote.

**6.** Our holding today is confined to cases where inadvertent errors occur in the administration of otherwise fair voting procedures. Under such circumstances, no claim that votes were unconstitutionally diluted can be made out under the equal protection clause in the absence of evidence of discriminatory intent. We intimate no opinion concerning the circumstances in which election laws may operate so unfairly as to constitute a denial of equal protection or due process, even without a showing of discriminatory intent. *See, e. g., Griffin v. Burns*, 570 F.2d 1065, 1078–79 (1st Cir. 1978); *Briscoe v. Kusper*, 435 F.2d 1046 (7th Cir. 1970).