Hurshell THRASHER, et al., Plaintiffs,

v.

BOARD OF SUPERVISORS OF AL-CORN COUNTY, MISSISSIPPI, et al., Defendants.

Civ. A. No. EC 90–62–D–D.

United States District Court,
N.D. Mississippi, E.D.

April 29, 1991.

---

James H. Mathis, Corinth, Miss., for plaintiffs.

Wendell H. Trapp, Jr., Corinth, Miss., for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This matter comes before the court on cross-motions for summary judgment. The plaintiffs, adult residents and registered voters of Alcorn County, Mississippi, allege that the defendants, the Alcorn County Board of Supervisors and its five elected members, violated their right to due process as guaranteed by the fourteenth amendment of the United States Constitu-

tion. Specifically, plaintiffs allege that they were denied the right to vote when defendants failed to comply with Section 19–9–11 of the Mississippi Code, which provides for elections on the issuance of road and bridge bonds when a certain percentage of electors has called for such an election by petition. Plaintiffs, asserting that they fully complied with the requirements of the code provision by attaining the required number of valid signatures, contend that defendants' refusal to hold an election on the bond issue violated their fundamental, constitutional right to vote and to have their votes counted. *See United States v. Mosley*, 238 U.S. 383, 386, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915). They seek declaratory and injunctive relief under 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

Finding the alleged abuses insufficient to rise to a constitutional impairment, *see Gamza v. Aguirre*, 619 F.2d 449, 455 (5th Cir.1980), *reh'g denied*, 625 F.2d 1016 (5th Cir.1980), the court concludes that the validity of this bond matter is a matter best left to state procedures for election challenges. Because of the absence of evidence of a constitutional violation sufficient to raise a claim under Section 1983, defendants' motion for summary judgment is

granted and plaintiffs' motion for summary judgment is denied. The factual background and authority for the court's decision are set forth in detail below.

## FACTUAL BACKGROUND [1]

By resolution, the Board of Supervisors of Alcorn County voted to issue road and bridge bonds on November 6, 1989. According to plaintiffs, all five districts of the county proposed to issue bonds and the bonds would be guaranteed by the county at large. Following the resolution, the plaintiffs, a group of citizens known as the ICG (Improved County Government) Group, began circulating petitions calling for elections on the bond issues.[2] The original petition as submitted contained 3,917 signatures. The County Registrar and the Board of Supervisors reviewed the petitions and "purged" the list of allegedly invalid signatures. Defendants contend that some individuals had requested that their names be removed from the protest petition, while other names were removed because they allegedly duplicated existing names on the list or did not reflect the names of actual registered voters. Plaintiffs challenge that many of the names were disallowed improperly.[3] Following

---

1. The court refers to plaintiffs' complaint and plaintiffs' itemization of material facts filed with their motion for summary judgment, and, where appropriate, to defendants' response to plaintiffs' itemization.

2. By seeking an election on the bond issue, plaintiffs sought to meet the requirements of a Mississippi Code provision which defines when an election must occur after a notice of intention to issue bonds. In part, the provision states:

 If twenty percent (20%), or fifteen hundred (1500), whichever is less, of the qualified electors of the county, supervisors district, or road district, as the case may be, shall file a written protest against the issuance of such bonds on or before the date specified in such resolution, then an election on the question of the issuance of such bonds shall be called and held as provided in Sections 19–9–13, 19–9–15. If no such protest be filed, then such bonds may be issued without an election on the question of the issuance thereof, at any time within a period of two years after the date specified in the above mentioned resolution ...

 Miss.Code Ann. § 19–9–11 (1972).

3. In their consolidated memorandum in opposition to defendants' motion for summary judgment and in support of their own motion, plaintiffs state, "[W]e can demonstrate that over one hundred and fifty (150) names should have been counted which were not." Consolidated Memorandum in Opposition to the Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment, pp. 6–7. Plaintiffs stated that proof on this matter would be complete "as discovery progresses," but the court has received no supplementation to plaintiffs' July 1990 memorandum that more clearly shows how names were deleted improperly.

 Although the court is mindful of a scheduling order in this cause which places the deadline for completing discovery at July 15, 1991, plaintiffs' claim that they may bring forth additional facts on the miscounting of names after additional discovery is not sufficient by itself to repel defendants' motion for summary judgment. *See, e.g., Gossett v. Du–Ra–Kel Corp.*, 569 F.2d 869, 873 (5th Cir.1978); *Oglesby v. Terminal Transport Co.*, 543 F.2d 1111, 1112 (5th Cir.1976). A nonmovant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts ...

this purge of allegedly invalid signatures, more than 1,500 signatures remained on the written protest. Because the code provision on bonds requires twenty percent or fifteen hundred signatures, whichever is less, of the "qualified electors of the county, supervisor's district or road district, as the case may be," plaintiffs contend that the voters of the county were entitled to an election as a matter of law and that the deprivation of this right created a denial of due process. They further note that even if the statute is read to require twenty percent or fifteen hundred signatures in each district—an interpretation they strongly contest—the signatures were sufficient to mandate an election in the third, fourth and fifth districts. Plaintiffs base this sufficiency on a list of qualified electors of Alcorn County compiled in December 1988 by Circuit Clerk and Registrar Jerry Moore.[4] The list, produced by defendants in response to discovery, shows the following number of qualified electors in each district:

| | |
|---|---|
| First District | 3386 |
| Second District | 4090 |
| Third District | 3148 |
| Fourth District | 3247 |
| Fifth District | 4030 |

Considering the signatures in light of this list and not at any later point in time,[5]

plaintiffs argue that a sufficient number of signatures was to have been present in districts three, four and five to require an election.

Defendants, on the other hand, argue: 1) that the bond matter was a "district bond issue" and, therefore, the statute "clearly requires" twenty percent or fifteen hundred qualified electors in *each* district; and 2) that the by-district figures ought to be determined not as of December 1988 but as of December 1989. Defendants apparently read the statute as requiring twenty percent or fifteen hundred in each district regardless of whether all the districts propose to issue the bonds and regardless of whether the bonds are backed by the full faith and credit of the entire county.[6] Defendants also state that the number of voters should be determined as of December 15, 1989, the due date of the protest petition. They offer Moore's affidavit reflecting figures of registered voters in December 1989 in an attempt to show that the total number of valid signatures to the protest petition does not meet the twenty percent or fifteen hundred figure in any of the districts. First and foremost, however, they argue that none of these alleged violations rise to the level of a constitutional

---

4. Plaintiffs' Memorandum, Exhibit B.

5. Plaintiffs state in their brief that the list was the most recent certification of the number of qualified electors of the county as of the time when the Board of Supervisors published its intention to issue bonds in November 1989. Defendants, on the other hand, contend that the figures for qualified electors ought to be determined as of December 1989 when the petitions were submitted.

6. Although the parties have supplied only a brief explanation of the way each of the districts proposed to issue bonds, defendants state that the Board of Supervisors chose to issue road and bridge bonds by district after determining that "[t]he needs of the various districts in Alcorn County [were] not identical." By choosing to issue bonds by districts, defendants add, the board was able to direct different amounts to the districts and tax each district "only to the extent that their district was receiving." Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 20.

particularly where ... ample time and opportunities for discovery have already lapsed." *SEC v. Spence & Green Chemical Co.,* 612 F.2d 896, 901 (5th Cir.1980) (citations omitted), *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981).

More importantly, additional supplementation on improper deletion of names would not create a Section 1983 claim. Even if names were "disallowed improperly" as plaintiffs contend, such proof, without more, would not rise to a constitutional violation. In the absence of evidence "that the alleged maladministration of the local election procedures was attended by [an] intention to discriminate against the affected voters," *see Gamza,* 619 F.2d at 454 (referring to denial of equal protection), or involved "purposeful conduct which threatened the democratic system," *see Duncan v. Poythress,* 657 F.2d 691, 704 (5th Cir. Unit B 1981) (referring to denial of due process), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647, *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982), garden-variety election irregularities will not create grounds for constitutional relief, as discussed in detail below.

deprivation and, therefore, that plaintiffs' Section 1983 claim must fail.

## DISCUSSION

Naturally, the law is not as straightforward as either of the parties suggest; by allowing elections upon petition by twenty percent or fifteen hundred, whichever is less, "of the qualified electors of the county, supervisor's district, or road district, *as the case may be* ..." Miss.Code Ann. § 19–9–11 (emphasis added), the provision is ambiguous as to what type of "case" calls for county as opposed to district-wide elections. Without much better guidance,[7] the court is asked to ponder whether this particular case—whereby each district proposed to issue bonds apparently guaranteed by the county at large—involves a county-wide matter or a district matter. From there, the court is asked to determine whether the percentage of qualified petitioners must be assessed against the number of voters in the entire county or merely in each of the districts, whether the protest petitions were correctly "purged" by defendants, and finally, whether the figures of eligible voters ought to be determined as of December 1988 or December 1989. Such inquiries threaten to lead this court far into the thicket of local election matters and far afield from the constitutional violations Section 1983 was intended to protect. Even when all facts are viewed in a light most favorable to plaintiff, the questions posed by this case relate more to the fine "details of administration of the election" for which state laws provide adequate remedy, *see Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir.1978), rather than to the basic administration of fairness which only occasionally calls for federal court involvement. Recognizing that all facts must be viewed favorably to the nonmoving party, however, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986),

the court will attempt to show why, as a matter of law, plaintiffs' federal claim must fail.

**(1) Summary Judgment Standard in the Context of a Section 1983 Claim**

■ It is well understood that a court should grant summary judgment only where no genuine issues of material fact exist and one party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party must present adequate basis for the motion, after which the non-moving party must counter with enough evidence to create a factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Facing a properly supported motion for summary judgment, the nonmovant bears the burden of establishing a genuine issue of material fact and "may not await trial or appeal" to develop responsive claims or defenses. *C.F. Dahlberg & Co. v. Chevron U.S.A., Inc.*, 836 F.2d 915, 920 (5th Cir. 1988). When considering which facts are material, a court should recognize that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Because the governing law in this case is a Section 1983 claim, the court's inquiry is narrowly framed by the statute. By definition, "Section 1983 does not create substantive rights; rather, it merely provides a remedy for deprivations" of federal constitutional or statutory rights. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 700 (5th Cir.1991). To be liable under Section 1983, a defendant must be a "person," acting "under color of state law" and in violation of the "Constitution or the laws of the United States." 42 U.S.C. § 1983. Defendants' motion for summary judgment focuses on the last part of the definition. Viewed together, the summary judgment

---

7. Defendants point to other sections of the Mississippi Code that discuss the issuance of bonds for road districts including Sections 31–13–5, 31–13–7, 31–13–9, 65–15–1 and 65–15–9. None of these statutes directly answer the question of whether obtaining an election on this particular bond matter should require a percentage of eligible voters in the district or the county as a whole. However, the court agrees with the defendants that exploring the full requirements for elections on road and bridge bonds is best left to state authorities.

and Section 1983 standards render all questions of election irregularity immaterial unless they rise to the level of a federal constitutional or statutory right.

(2) Whether the Constitution or the Laws of the United States were Violated

(a) *Whether Defendants' Behavior Arguably Amounted to a Violation of Substantive Due Process*

■ Plaintiffs primarily rely on the Fifth Circuit opinion in *Duncan* for the proposition that "rare, but serious violations of state election laws" may " 'operate so unfairly as to constitute a denial of ... due process ...' " *Duncan,* 657 F.2d at 699 (quoting from *Gamza,* 619 F.2d at 454 n. 6). Of course, the applicability of *Duncan* depends on whether the refusal to hold an election on the bond matter here is such a "rare, but serious" violation of election laws or whether it is more similar to a "garden-variety" election challenge such as ballot counting or election administration which are best left to the states.

While recognizing that the Constitution leaves the states broad power "to regulate the conduct of federal and state elections," the *Duncan* court found a substantive due process violation in a scheme by Georgia officials to deny the electorate the right to choose a replacement justice via a special election mandated by Georgia law. *Id.* at 702–03. Finding no ambiguity in the way the Georgia election laws were meant to operate and the intent of officials to avoid the law, the court found that the officials' behavior implicated "the very integrity of the electoral process," *Id.* at 703, thereby

amounting to a violation of substantive due process. *Id.* at 704–05. In other words, grounds for federal intervention existed in *Duncan* because of the purposeful intention of Georgia officials to violate clearly established law. By contrast, the law in the case here is not clearly established,[8] nor have plaintiffs produced evidence of purposeful conduct on the part of the Board of Supervisors. The instant case is more like the line of circuit court authority cited in *Griffin,* 570 F.2d at 1076–77, which avoids using Section 1983 as a panacea for run-of-the-mill election irregularities. *See, e.g., Hennings v. Grafton,* 523 F.2d 861 (7th Cir.1975) (no constitutional deprivation or Section 1983 claim in case involving the malfunctioning of voting machines in an election for county office); *Hubbard v. Ammerman,* 465 F.2d 1169, 1181 (5th Cir. 1972) (federal courts should "not intervene in state election contests for the purpose of deciding issues of state law"), *cert. denied,* 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973); *Powell v. Power,* 436 F.2d 84, 86 (2d Cir.1970) (federal courts should not be "thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.") Even if defendants did improperly eliminate signatures on the protest petition or view the required number of signatures too restrictively, these cases show that the proper avenue for such claims was through established state election procedures and not the federal courts.[9]

8. Plaintiff has not produced authority to show how a bond matter, even if intended to occur in every district in the county, mandates that eligible petitioners be drawn from the county as a whole. Citations to the "clear language" of Section 19–9–11 of the Mississippi Code are not enough when a fair reading of the provision renders its meaning ambiguous.

9. Although the case was not supplied or discussed by the plaintiffs, the court has carefully considered language which, at first glance, appears favorable to the plaintiffs in the Fifth Circuit case of *Pendleton v. Heard,* 824 F.2d 448 (5th Cir.1987). In *Pendleton,* plaintiffs challenged a practice by the board of supervisors of withdrawing notice of bond issues each time a

protest was filed rather than holding an election. They also challenged the board's practice of noticing five separate district bond issues instead of noticing the issue county-wide. *Id.* at 451. Both challenges were brought under Section 5 of the Voting Rights Act.

Although a federal district court, citing the Tax Injunction Act, had dismissed the complaint for lack of jurisdiction, the Fifth Circuit reversed, holding that the federal court did have jurisdiction. Noting that plaintiffs were challenging "their right to vote on ... bond issues," and not the bond issues themselves, the court held that jurisdiction properly resided with the federal court. *Id.* Like other voting procedures differing from those in force or effect on No-

As noted by the defendants, Mississippi does provide a procedure for protesting the action of a board of supervisors in issuing or attempting to issue bonds. *See* Miss. Code Ann. §§ 11–51–75, 31–13–5 (1972). Section 11–51–75 provides that objections relating to the issuance and sale of bonds "shall be adjudicated and determined by the chancery court in accordance with Section 31–13–5 to 31–13–11 . . . ." Miss.Code Ann. § 11–51–75 (1972). Section 31–13–5 then provides a set time for notice and a hearing on the bond matter. The section further provides that

> [I]f at the hearing any taxpayer of the county, municipality or district issuing said bonds appears and files, or has filed written objection to the issuance of said bonds, then the chancellor, or the chancery clerk, if the chancellor be not present, shall set the case over for another day convenient to the chancellor . . . On the hearing, the chancellor may hear additional competent, relevant and material evidence . . . so as to inquire into the validity of the bonds or other obligations proposed to be issued, and enter a decree in accordance with this finding . . .

*Id.*

Finally, the section provides that upon a written objection "an appeal shall be granted as in other cases, provided such appeal be prosecuted and bond filed within twenty days after the chancellor enters his decree . . . ." *Id.* Other language in Section 31–7 provides for when a final decree validating bonds shall be conclusive. Miss. Code Ann. § 31–13–7 (1972).

■ The court cannot say whether these procedures were followed in this case or whether such procedures were even appropriate given the interplay of several code provisions on road and bridge bonds. Defendants merely say that such procedures "existed" without explaining whether they were made available to the plaintiffs. Plaintiffs, in turn, do not appear to allege a violation of procedural due process,[10] nor do they respond to defendants' reliance on the above provisions in defendants' motion for summary judgment. Where a state procedure appears to exist for permitting and possibly resolving challenges, *see Johnson v. Hood*, 430 F.2d 610, 613 (5th Cir.1970), the power to control the details of such matters is normally conferred to the states. Of course, when the particular conduct was inflicted intentionally rather than accidentally, or where it was part of "a pattern [to] erode . . . the democratic process" rather than a mere "negligent failure to properly carry out the state ordained electoral process," *Gamza*, 619 F.2d at 453, the conduct may indeed rise to the level of a constitutional violation. However, the facts presented do not suggest that this is the case here. Finding no evidence of an intention[11] to wilfully eliminate

vember 1, 1964, new practices of withdrawing notice of bond issues and noticing them in five separate districts arguably constituted changes in procedure requiring preclearance from the United States Attorney General. *Id.* at 450–51 (citing Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1981)). Just as a change in polling places to new locations would create a claim for federal court determination, so did the new practices in *Pendleton. Id.* at 451.

*Pendleton* is distinguishable from the present case. First, plaintiffs in the present case do not claim a Voting Rights Act violation, but instead ground their complaint entirely in due process. The court is not asked to determine whether noticing an election in five separate districts is a new practice or procedure contemplated by the Voting Rights Act, but rather, whether such a practice rises to a rare, but serious violation of the right to vote. Second, *Pendleton* focused on the Tax Injunction Act and the district court's incorrect determination that the act prevented the district court from exercising jurisdiction.

Here, the court refuses to exercise jurisdiction for reasons of lack of a constitutional or federal claim cognizable under Section 1983.

10. *See* part (2)(b) of the court's opinion.

11. By referring to "intentional" behavior, the courts look for the intentional violation of an established, fundamental right. In this case, the closest plaintiffs come to alleging intentional behavior on the part of defendants is in their answers to defendants' first set of interrogatories in which they assert that the right to vote on bond matters is guaranteed by Section 19–9–11 and that defendants deprived them of this right by their "orchestration of such bond issue." Even supposing that defendants "orchestrated" ambiguous code provisions to their advantage, defendants' intentional reading of the provision in a light favorable to their views would not create a constitutional violation. The Constitution does not specify a particular right

names or miscount petitions—violations that arguably would create an abrogation of a fundamental, constitutional right—the court concludes that plaintiffs' substantive due process claims must fail.

### (b) Whether Defendants' Behavior Arguably Amounted to a Violation of Procedural Due Process

■ Although *Duncan* found that avoidance of the Georgia election laws amounted to a substantive due process violation because of the "abrogation of [the] constitutionally protected right to vote," *Duncan,* 657 F.2d at 704–05, at least one of the cases on which *Duncan* relied discussed possible violations of procedural due process as well. For example, in *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir.1970), the Seventh Circuit first determined that a failure of state officials to notify prospective candidates of new and complex ballot placement procedures and to allow the candidates an adequate opportunity to examine disqualified petitions impaired liberty interests protected by the due process clause of the fourteenth amendment. *Id.* at 1054. The court then went on to consider and reject an alleged violation of procedural due process in the holding of a hearing on objections to nominating petitions after questionable notice. *Id.* at 1056.

As noted, plaintiffs in the instant case appear to allege a violation of substantive, rather than procedural, due process. Because their Section 1983 claim broadly relies on "due process," however, the court has searched the record for facts which arguably might create a procedural due process claim and, therefore, an arguable claim under Section 1983. But while plaintiffs repeatedly refer to the alleged miscounting of protest petitions, the attempted circumvention of Mississippi law and the "clear" abrogation of plaintiffs' right to vote, none of the evidence supplied by plaintiffs suggests that they were denied either a hearing or an opportunity to be heard. Even if such allegations were present, the state procedures cited above appear fully adequate to satisfy the requirements of due process. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Therefore, plaintiffs' Section 1983 claim fails for lack of an arguable claim under either substantive or procedural due process.

### (3) Why Retaining Jurisdiction Is Inappropriate in this Case [12]

■ The principles of abstention set forth by the Supreme Court in *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), allow a federal court to abstain pending resolution of ambiguous state law issues when resolution of such issues might eliminate or substantially modify a federal constitutional question.[13] *Nissan Motor Corp. v. Harding,* 739 F.2d 1005, 1008 (5th Cir.1984); *Brooks v. Walker County Hosp. Dist.,* 688 F.2d 334, 336 (5th Cir.1982), *cert. denied,* 462 U.S. 1105, 103 S.Ct. 2452, 77 L.Ed.2d 1332 (1983). The federal court may then retain jurisdiction until the state issue is resolved so that the litigant may reserve possible claims for federal court disposi-

---

to vote on bond issues, *see, e.g., Johnson,* 430 F.2d at 612 ("right to vote in a state election, in itself, is not a right secured by the Constitution or by Federal law"), nor does it specify the precise manner—by county or by district—for protest petitions to be counted. Because the right to vote on bond matters after a certain number of petitions have been filed is conferred by state law, interpretation of that law is appropriately left to state and local authority.

**12.** Although plaintiffs did not raise the issue of *Pullman* abstention in their brief, the court briefly considers the appropriateness of the doctrine because the *Duncan* case on which plaintiffs so heavily rely discusses it in detail.

**13.** In *Pullman,* a railroad company challenged an order from the Texas Railroad Commission under both Texas law and the federal Constitution. The Supreme Court concluded that if state courts found that the challenged order violated state law, no reason would exist for reaching the constitutional claim. Thus, abstention was appropriate so the state courts could definitively construe the state statute, a construction that might possibly render the constitutional question moot. *Pullman,* 312 U.S. at 498, 61 S.Ct. at 644.

tion. *Nissan Motor Corp.*, 739 F.2d at 1011. *Pullman* abstention cannot help the plaintiffs here, however, because of the absence of a constitutional question. Even if this court were to wait for state courts to resolve what appears to be an ambiguous provision in the Mississippi Code, plaintiffs would still have failed to show, as a matter of law, the type of federal or constitutional violation warranting this court's jurisdiction under Section 1983.

As noted in previous sections of this opinion, plaintiff has presented no evidence to show that defendants willfully eliminated names or miscounted petitions in bad faith. At most, plaintiffs suggest that defendants "orchestrated" ambiguous code provisions to their advantage, a claim that does not rise to the level of a constitutional violation when the right to vote on bond matters is conferred by the statute itself. In asking itself whether a reasonable jury could find for the plaintiffs on their Section 1983 action, the court concludes that a jury could not.

### CONCLUSION

Impressed as the court is with plaintiffs' desire to press for improved government, the rights they seek are properly resolved by state authorities and state courts. For all of the above reasons, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted.