Jack **SCHEER**, Doris K. Scheer, Abe Sikma, Vicente San Pelayo, Esther Gutierrez, Antonio Cuenca, Bertha Cuenca, Nieves Sotolongo, Aida Victoria Ortega, Natalio Ortega, Maria Olimpia Duque, on behalf of themselves and others similarly situated, Plaintiffs,

v.

**CITY OF MIAMI**, City of Miami Canvassing Board for the November 4, 1997 City of Miami Election, Walter J. Foreman. David Leahy, Xavier L. Suarez, and Joe Carollo, Defendants.

No. 98–0835–CIV.

United States District Court,
S.D. Florida,
Miami Division.

July 21, 1998.

Thomas R. Spencer, Jr., Spencer & Klein, P.A., Miami, FL, for Plaintiffs.

Benedict Kuehne, Sale & Kuehne, P.A., Miami, FL, Kendall Coffey, Coffey Diaz & O'Naughton, LLP, Coconut Grove, FL, Joseph Geller, Geller, Geller, Garfinkel & Fisher, Hollywood, FL, John Shubin & Jeffrey Bass, Shubin & Bass, P.A., Miami, FL, for Carollo.

William Candela, Assistant County Attorney, Miami, FL, for Leahy, Margolis & Silverman.

Xavier Suarez, Miami, FL, for pro se.

Charles Mays, Miami, FL, for City of Miami.

## OMNIBUS ORDER

EDWARD B. DAVIS, Chief Judge.

BEFORE THE COURT are numerous cross-motions for summary judgment and motions to dismiss. After reviewing all of the voluminous motions and the relevant case law, and after hearing oral argument, the Court enters summary judgment in favor of the Defendants.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The genesis of this lawsuit is the November 4, 1997, Miami Mayoral election.[1] On November 4, 1997, the City of Miami held a general election for the position of Executive Mayor, with Joe Carollo and Xavier Suarez as the primary contenders. Neither Carollo nor Suarez received a majority of the overall votes; therefore, the City held a run-off election on November 13, 1997. In that election, Suarez defected Carollo in both precinct votes and absentee votes. On November 14, 1997, those results were certified and Suarez assumed the position of Mayor of the City of Miami.

Three Miami voters brought an *in rem* state lawsuit challenging the vote count in the first election pursuant to Section 102.166, Fla. Stat. (1997). Carollo and Suarez intervened in that action. The Plaintiffs in this case did not.

Judge Thomas Wilson, Jr., for the Circuit Court of the Eleventh Judicial Circuit of Florida, found that massive absentee voter fraud tainted the electoral process.

"Witness after witness testified, without contradiction, that they either 1) did not vote, 2) did not sign the ballots in question, 3) did not live in the district in which their ballot was cast, 4) did not live in the City of Miami, 5) did not know the person who 'witnessed' their signature or said someone other than the names witness actually 'witnessed' their vote, 6) did not live at the address that was given on the request for

---

1. At the outset, the Court notes that the parties have agreed that there are no factual disputes in this case. Accordingly, the Court's statement of facts is based primarily on the opinion of the Third District Court of Appeals of Florida in *In*

*Re Matter of the Protest of Election Returns and Absentee Ballots in the November 4, 1997 Election for the City of Miami, Florida,* 707 So.2d 1170 (Fla. 3rd DCA 1998), as well as the state trial court's opinion ("trial court").

the absentee ballot, 7) did not request an absentee ballot and/or 8) did not qualify as 'unable to vote.' "

Trial Court at 2–3. Judge Wilson found that this fraud scheme, "literally and figuratively, stole the ballot from the hands of every honest voter in the City of Miami." *Id.* at 3. As a result, "the integrity of the election was adversely affected." *Id.* Judge Wilson held that the appropriate remedy was to void the first Mayoral election and hold a new election.

The Third District Court of Appeal of Florida agreed that massive fraud occurred in the electoral process, but held that the appropriate remedy was to invalidate only the absentee ballots from the November 4, 1997, election. The court citing to almost sixty years of Florida precedent stated that it "refuse[d] to disenfranchise the more than 40,000 voters who, on November 4, 1997, exercised their constitutionally guaranteed right to vote in the polling places of Miami." *See In Re Matter of the Protest,* 707 So.2d at 1174 (citing *State ex rel. Whitley v. Rinehart,* 140 Fla. 645, 192 So. 819, 823 (Fla.1939); *Wilson v. Revels,* 61 So.2d 491 (Fla.1952); *Boardman v. Esteva,* 323 So.2d 259 (Fla. 1975); *Bolden v. Potter,* 452 So.2d 564 (Fla. 1984)). Because Carollo received a majority (51.41%) of the machine vote in the initial election, the court declared him the Mayor of Miami.

In this case, Plaintiffs represent the class of absentee voters who lawfully cast their absentee votes but whose votes were not counted pursuant to the Third DCA's ruling. Plaintiffs, in their two count complaint for declaratory judgment (Count I) and for injunctive relief (Count II), seek a new election. Plaintiffs basically contend that by voiding their votes, their constitutional rights under the First and Fourteenth Amendments were violated.

## II. STANDARD OF REVIEW

Federal courts shall grant summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Because the parties agree that the issues presented to the Court are purely legal and that no genuine issues of material fact exist, they have filed cross-motions for summary judgment.

## III. ANALYSIS

■ This case presents the difficult question of when a federal court should involve itself with a state election dispute. There is no doubt that the right to vote is one of the most basic and fundamental of rights. However, federal courts can only intervene in a state election dispute in the most extreme circumstances. This case does not present one of those circumstances. Moreover, public policy dictates that this Court not meddle with the state process. Accordingly, the Court will grant summary judgment for the Defendants.

Before discussing the merits of Plaintiffs' claim, the Court must first address Defendants argument that the Court should abstain.[2] "There are some classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is 'the normal thing to do.' " *New Orleans Pub. Serv.,* 491 U.S. 350, 359, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Younger v. Harris,* 401 U.S. 37, 45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). Defendants point to two of these classes: *Rooker–Feldman* abstention and *Younger* abstention.

■ The *Rooker–Feldman* doctrine, as enunciated in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct.

**2.** In addition to abstention, Defendants also challenge Plaintiff's standing. They argue that Plaintiffs do not have standing because even with their votes for Suarez, Carollo would still have won the election. Neither the trial nor appellate state court, however, made this finding as it could not identify exactly how many votes were fraudulently cast. If they could, the remedy would have been obvious—invalidate the fraudulent votes and count the lawful ones. However, isolating the number of fraudulent votes is and was impossible. Therefore, it is also impossible to know for sure if Carollo would have won the election even counting the class in this case. Accordingly, Plaintiffs have standing because they have an identifiable harm—their votes were invalidated even though they were lawfully cast.

149, 68 L.Ed. 362 (1923), holds that lower federal courts cannot engage in appellate review of state court decisions. *Feldman,* 460 U.S. at 482, 103 S.Ct. 1303. The Court reasoned that once in the state court system, litigants must exhaust all means of appeals in that system. *Id.* at 483, 103 S.Ct. 1303. A litigant may then appeal the final state court decision to the United States Supreme Court. *Id.*

■ Nevertheless, the *Rooker–Feldman* doctrine only applies to litigants who were parties of both the state court decision and the federal claim. *See Johnson v. De Grandy,* 512 U.S. 997, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (holding that because the United States was not a party to the state court action, *Rooker–Feldman* was not a bar to its federal claims); *Roe v. State of Alabama,* 43 F.3d 574, 580 (11th Cir.1995) (holding *Rooker–Feldman* did not deprive district court of subject matter jurisdiction to entertain claims of voter and two candidates because they were not parties to state court action); *Marks v. Stinson,* 19 F.3d 873, 885 (3d Cir. 1994) (holding that Latino absentee voters were not barred by *Rooker–Feldman* because they were not parties to any of the state court proceedings). The reasoning of these courts is clear: if a person is not a party to the state court proceeding, there would be no opportunity-to-raise her constitutional claims. *See, e.g., Roe,* 43 F.3d at 580. In this case, Plaintiffs had nothing to do with the state court proceedings. They are presenting their claims for the first time before this Court. Accordingly, *Rooker–Feldman* does not present a bar for the exercise of jurisdiction in this case.[3]

■ Defendants also incorrectly urge the Court to invoke the *Younger* abstention doctrine. In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts should abstain from enjoining state criminal prosecutions absent extraordinary circumstances. Since then, the Court has extended this doctrine to apply to noncriminal proceedings in which significant state interests are involved.

*See Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). The *Younger* abstention doctrine derives from "the vital consideration of comity between state and national governments." *Luckey v. Miller,* 976 F.2d 673, 676 (11th Cir.1992). Although *Younger* abstention is founded on notions of comity "the [mere] pendency of an action in state court is no bar to proceedings concerning the same subject matter in the federal court having jurisdiction." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

■ Defendants argue that there is no valid reason to interfere in ongoing state proceedings. This argument relies on the basic premise that a ruling by this Court would interfere with ongoing state proceedings. This is not the case. There is no state court proceeding in which these Plaintiffs are a party. Plaintiffs are seeking purely federal remedies and have no involvement in the state action which involves questions of state law.

The Court also notes that if a party claims a violation of the federal Civil Rights Act, he or she has no duty to exhaust state remedies before pursuing the claims in federal court. *See Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). "In the absence of a showing of some potential for interference with an ongoing state proceeding, *Younger* principles do not bar a Civil Rights Act plaintiff from going forward in a federal forum simply because there are unexhausted possibilities for state litigation over the same subject matter." *Marks,* 19 F.3d at 883.

■ Although Plaintiffs are technically correct that the Court should not abstain on the basis of *Rooker–Feldman* or *Younger,* many federal courts have held that they should not intervene in state election disputes. "Subject to specific exceptions, federal courts should not be involved in settling

---

**3.** Similarly, the Court does not find persuasive Defendants' arguments that *res judicata* and collateral estoppel bar Plaintiffs' claims. These arguments of claim and issue preclusion are closely related to the principles embodied in *Rooker–*

*Feldman. See Valenti v. Mitchell,* 962 F.2d 288, 297 (3d Cir.1992). Because different parties, claims, and issues were presented to the state court, *res judicata* and collateral estoppel do not prevent Plaintiffs from bringing this action.

state election disputes." *Curry v. Baker,* 802 F.2d 1302 (11th Cir.1986); *see also Bennett v. Yoshina,* 140 F.3d 1218, 1225 (9th Cir. 1998); *Marks,* 19 F.3d at 888; *Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir.1978). Only when election irregularities are fundamentally unfair and transcend "garden variety" problems do federal courts have a duty to step in to ensure that citizens' rights are protected. *Roe,* 43 F.3d at 580. The Court, therefore, must determine whether this case is just another garden variety election dispute or whether Plaintiffs have been subjected to fundamental unfairness.[4]

More often than not, federal courts find that the problem is garden variety and do not intervene in state election disputes. *See, e.g., Gold v. Feinberg,* 101 F.3d 796, 801 (2d Cir.1996) (refusing to intervene where human error resulted in miscounting of votes, presence of ineligible candidates on ballot, and delay in arrival of voting machines); *Bodine v. Elkhart County Election Bd.,* 788 F.2d 1270, 1272 (7th Cir.1986) (mechanical and human error in counting votes); *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir.1983) (technical deficiencies in printing ballots); *Gamza v. Aguirre,* 619 F.2d 449, 454 (5th Cir.1980) (negligent vote counting); *Hennings v. Grafton,* 523 F.2d 861 (7th Cir.1975) (malfunction of voting machines); *Pettengill v. Putnam County R–1 School Dist.,* 472 F.2d 121, 122 (8th Cir.1973) (counting votes that were illegally cast); *Powell v. Power,* 436 F.2d 84 (2d Cir.1970) (non-party members mistakenly allowed to vote in congressional primary); *Johnson v. Hood,* 430 F.2d 610, 613 (5th Cir.1970) (arbitrary rejection of 10 ballots).

In a case with strikingly similar facts, the Eleventh Circuit cautioned district courts not to meddle with a state election dispute. *Curry,* 802 F.2d 1302. There, the plaintiffs argued that the state of Alabama incorrectly dealt with massive illegal voting. *Id.* at 1305. The Eleventh Circuit declined to answer that question for "reasons grounded in both law and public policy...." *Id.*

*Curry* involved a primary runoff election for the Democratic candidate for Governor of Alabama. Initially, it looked like Charles Graddick had won, but like this case, there was massive illegal voting. Therefore, the State Democratic Committee certified William Baxley, who received the majority of the legal votes, as the winner. Graddick and his supporters brought suit arguing that the election committee did not use the correct methods for counting and determining the lawfully cast votes. The district court agreed and ordered the Democratic Party to conduct a new primary and enjoined the disqualification of Graddick.

The Eleventh Circuit reversed, reasoning that it was not its role to " 'oversee the administrative details of a local election.' " *Id.* at 1315. (quoting *Pettengill v. Putnam County R–1 School District, Unionville, Mo.,* 472 F.2d 121 (8th Cir.1973)). As *Curry* clearly demonstrates, it is not the job of a federal court to involve itself with settling disputes as to how the state deals with counting votes after illegal votes are cast. Instead, a federal court should only intervene into state election disputes where the entire process is fundamentally unfair. "Episodic events" don't count. *Curry,* 802 F.2d at 1314. Our predecessor court in *Gamza v. Aguirre,* 619 F.2d 449, 453 (5th Cir.1980),

> recognize[d] a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a [constitutional violation].

This instant action represents an isolated or "episodic event" that does not demonstrate that the entire process is fundamentally unfair.

---

**4.** Defendants argue that the Court need not reach this issue because absentee voting is a privilege and not a right. Defendants are correct that there is no right to vote by absentee ballot, but their characterization is misleading. Florida, of course, can restrict or perhaps even eliminate absentee voting under the appropriate circumstances *before* these votes are cast. The question then is whether Florida can restrict these votes after they are cast when there is evidence of massive fraud. As explained later, federalism and equity prevent this Court from telling Florida that it cannot in this case.

Plaintiffs argue, however, that another Eleventh Circuit case is more similar to the instant action. *See Roe,* 43 F.3d 574. The Court disagrees.

In that case, the prior Alabama practice had been not to count absentee ballots unless they were notarized or witnessed; but after the 1994 election, an Alabama court ordered the improperly submitted absentee ballots to be counted. The *Roe* court determined that the election was fundamentally unfair for two reasons: 1) that Alabama was diluting the votes of those who had lawfully voted, and 2) that Alabama had disenfranchised those people who would have voted but for the inconvenience imposed by the notarization and witness requirements. *Id.* at 581. The difference between *Roe* and this case (as well as *Curry* ) is that in *Roe,* the state changed its policy after an election. The Eleventh Circuit in *Roe* did not involve itself with settling an isolated dispute about fraud. Instead, it intervened because the state's policy changed after an election. Here, Florida did not change its policy at all. It stayed true to course—if there is massive fraud with absentee votes, they can be invalidated. *See Rinehart,* 192 So. at 823. In fact, there is a "complete absence of any Florida Appellate Court decision upholding the ordering of a new election in the face of such fraudulent conduct relating to absentee ballots." *See In Re Matter of Protest,* 707 So.2d at 1173.

Plaintiffs also rely on cases from the Third and First Circuits. These cases are persuasive, but in the end, do not control this Court's decision. The Third Circuit defined more broadly than the Eleventh Circuit when a federal court should intervene in state election disputes. *Marks,* 19 F.3d at 873. In *Marks,* in Pennsylvania's second senatorial district election, the Republican candidate, Bruce Marks, received the majority of the machine votes over Democrat William Stinson. Stinson, however, won the bulk of the absentee votes. Because of the huge number of absentee ballots cast for Stinson, he won the election 20,523 to 20,062. Marks brought state and federal proceedings against Stinson alleging that his opponent engaged in absentee voter fraud. The district court, deciding not to abstain, voided all absentee votes finding that there was massive fraud and enjoined Stinson from assuming office and declared Marks the winner based solely on the machine vote. The Third Circuit remanded the case back to the district court to determine whether the results would have been the same absent the wrongdoing, with instructions that the district court "will have authority to order a special election, whether or not it is able to determine what the results would have been in the absence of that violation." *Id.* at 889.

*Marks,* however, did not present a situation where a federal court had to step in and invalidate sixty years of state law. Instead, the Third Circuit simply overruled the district court's decision to invalidate absentee votes. This case is fundamentally different because here, a federal district court would have to meddle with the state's determination of what an appropriate remedy is, and would also have to examine whether sixty years of precedent should be overturned. The Court declines to do so.

Plaintiffs also cite to a First Circuit case in which the court intervened, *Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978). This case arose out of a Rhode Island local primary in which the state had encouraged citizens to vote by absentee ballot. *Id.* After citizens took the bait, the Rhode Island Supreme Court found that absentee voting was not authorized for primary elections and invalidated those votes. The court then ordered the decertification of the winner and the board of canvassers certified a new winner based solely on the machine cast votes. *Id.*

The absentee voters then filed a class action in federal court alleging that the Rhode Island Supreme Court, by invalidating their votes violated the Due Process Clause of the Fourteenth Amendment. The district court agreed and the First Circuit affirmed, finding that plaintiffs had relied on the government's assurances that absentee ballots would be counted. *Id.* at 1067. Based on these unique circumstances, the First Circuit found "broad-gauged unfairness" which implicated the state's integrity and the integrity of the election results. The court recognized, however, that the Constitution confers the "power to control the disposition of contests over elections to ... state and local offices."

*Id.* at 1077 (quoting *Hubbard v. Ammerman,* 465 F.2d 1169, 1176 (5th Cir.1972)).

Like Alabama in *Roe,* Rhode Island changed the rules half way through the game. The state told voters one thing before the election and changed its policy thereafter. This was unacceptable and of course, the First Circuit had to intervene. Florida, on the other hand, maintains its policy of remedying fraud. It has not changed the rules of the game and neither will this Court.

The Ninth Circuit, in refusing to meddle with a state election, summarized the law in all of these election cases:

> A general pattern emerges from all of these cases taken together. ***Mere fraud or mistake will not render an election invalid.*** However, a court will strike down an election ... if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures.

*Bennett,* 140 F.3d at 1226 (emphasis added). This case is about mere fraud—nothing more. It has nothing to do with reliance on an established procedure or a change in the election procedures. If anything, the voters must be presumed to have known of Florida's procedure of voiding all absentee votes if there was evidence of fraud. *See Bolden v. Potter,* 452 So.2d 564 (Fla.1984); *Boardman v. Esteva,* 323 So.2d 259 (Fla.1975); *Wilson v. Revels,* 61 So.2d 491 (Fla.1952). This policy was followed by the Third District Court of Appeal, not changed.

Florida courts have established and followed this policy for good reason. The absentee voting scheme as it now exists in Florida lends itself to fraud, manipulation, and deceit. The state legislature continues to attempt improvements, but to date criminals have found ways to abuse the system. Accordingly, Florida courts for the past sixty years have constructed a means of dealing with absentee voter fraud. It is not this Court's province to upset this remedy as it has been well thought out by the state courts. For example, as the state appellate court in this case noted, "were we to approve a new election as the proper remedy following extensive absentee voting fraud, we would be sending out the message that the worst that would happen in the face of voter fraud would be another election." *See In Re Matter of Protest,* 707 So.2d at 1174. For these reasons, the Eleventh Circuit in *Curry* held that state election disputes were better dealt with by "the court system of the affected state." 802 F.2d at 1302.

Even if Plaintiffs were able to set forth a constitutional violation, the Court must take into account equitable considerations in fashioning the appropriate remedy in each case. *See Reynolds v. Sims,* 377 U.S. 533, 585, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Soules v. Kauaians for Nukolii Campaign Committee,* 849 F.2d 1176, 1180 (9th Cir.1988). "A federal court reaching into the state political process to invalidate an election necessarily implicates important concerns of federalism and state sovereignty. It should not resort to this intrusive remedy until it has carefully weighed all equitable considerations." *Gjersten v. Board of Election Comm'rs,* 791 F.2d 472, 478 (7th Cir.1986).

*Soules* involved a challenge to a special election in Hawaii. In denying Plaintiffs' claims, the court basing its decision on latches weighed the severity of the alleged constitutional violation against "such countervailing equitable factors as the extremely disruptive effect of election invalidation and the havoc it wreaks upon [the] local political community." 849 F.2d at 1180. Indeed, the old Fifth Circuit, whose decisions are of course binding on this Court, stated that even in cases of racial discrimination, the voiding of a state election is a "drastic if not staggering" remedy. *Bell v. Southwell,* 376 F.2d 659, 662 (5th Cir.1967). The almost circus atmosphere surrounding this case makes the remedy Plaintiffs seek even more drastic and staggering. Plaintiffs could have intervened in the state case, as did Xavier Suarez. They did not. Instead, they waited until the trial was completed, the appeal and cross-appeal were filed, the appellate opinion was issued, rehearing and certification were petitioned for and denied, and discretionary review in the Florida Supreme Court was invoked before coming to this Court to request relief. The City of Miami has been scarred by the events that took place during and after the

1997 Mayoral election. The City and its citizens are finally starting to heal. Equity necessitates that the Court not re-open these wounds.

### CONCLUSION

Federal courts rarely meddle with state election disputes. This case is no exception. The massive absentee fraud during the November, 1997, Mayoral election was an episodic event that was addressed by the state. The Eleventh Circuit as well as the majority of courts explain that it is not the job of the federal court to intrude into these brief episodes. Furthermore, equity demands that the Court stay on the sideline of this state dispute. Accordingly, it is

ORDERED AND ADJUDGED that summary judgment is entered for Defendants and denied for Plaintiffs. All motions for extensions of page limitations are GRANTED. Defendants' request for fees and costs is DENIED. The clerk is instructed to CLOSE THIS CASE and DENY ALL PENDING MOTIONS AS MOOT.